[No. 54336-9-I.    Division One.    October 3, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. ALEX UNDRAE PAUL MOORE, *Appellant*.

*Susan F. Wilk* (of *Washington Appellate Project*), for appellant.

*Janice E. Ellis, Prosecuting Attorney*, and *Thomas M. Curtis, Deputy*, for respondent.

¶1 Cox, C.J. — A warrantless search or seizure is presumed unreasonable under the Fourth Amendment.[1] A narrow exception to the warrant requirement exists when the police act in a community caretaking role.[2] This role encompasses search and seizure of automobiles, emergency

---

[1] *State v. Acrey*, 148 Wn.2d 738, 754, 64 P.3d 594 (2003).

[2] *Acrey*, 148 Wn.2d at 755.

aid, and routine checks on health and safety.[3] When acting in such a role, the police may be justified in making a warrantless search or seizure.[4] Courts cautiously apply the exception because of the potential for abuse.[5]

¶2 Another exception to the warrant requirement is a *Terry* stop.[6] "The reasonableness of such a detention depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' "[7] The State bears the burden of showing that the search or seizure falls within exceptions to the warrant requirement.[8]

¶3 Here, a police officer stopped an automobile that was registered to an owner who was reported "missing/endangered." During the brief detention of the automobile's driver and its passengers, the officer was unable to fully dispel her concern whether any passenger was the person reported as missing/endangered. But the officer's interaction with Alex Moore, one of the passengers, indicated that he was the subject of an outstanding felony warrant. Following verification of his identity through the alias he gave police and distinctive tattoos on his forearms, police arrested him based on the warrant. In a search incident to arrest, they discovered the controlled substance that is the basis for this prosecution. The entire interaction between police and Moore from the time of his stop to his arrest took between 10 to 15 minutes.

¶4 We hold that the initial stop, brief detention, and police interaction with Moore were valid because they were based on the community caretaking function. When the

---

[3] *State v. Kinzy*, 141 Wn.2d 373, 386, 5 P.3d 668 (2000).

[4] *Acrey*, 148 Wn.2d at 756 (Sanders, J. dissenting) (citing *Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973)); *Kinzy*, 141 Wn.2d at 386.

[5] *Acrey*, 148 Wn.2d at 750.

[6] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[7] *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)).

[8] *Acrey*, 148 Wn.2d at 746 (quoting *Kinzy*, 141 Wn.2d at 384).

purpose of the police interaction changed from community caretaking to criminal investigation, the police reasonably developed the information they then had to verify Moore's identity as the subject of the outstanding felony warrant. Finally, the search incident to arrest leading to the discovery of the evidence was valid. We affirm.

¶5 Sergeant Kate Hamilton of the Mill Creek Police Department was exiting a parking lot in her marked patrol car when she was nearly struck by another car entering the lot. She ran the license plate number of the car through her computer and learned that Robert Morris, the registered owner, was listed as "missing/endangered" from the Seattle area. The listing neither provided a physical description of Morris nor explained anything more about his status or the reasons for it.

¶6 Hamilton caught up to and stopped the car to determine if Morris was inside. The driver was a woman. It was dark and Hamilton was initially unable to determine how many passengers were inside the car.

¶7 Sergeant Hamilton informed the occupants why she had stopped the car and asked the passengers if any of them was Morris. Each passenger said he was not. The front passenger, later identified as Moore, stated that they had borrowed the car from Morris. Moore also said that Morris was at his house waiting for them.

¶8 Sergeant Hamilton asked the passengers for identification. The driver, Moore, and the second passenger each provided only verbal identification—a name and a date of birth. Moore gave the name "Kenneth Black" and a false birth date. The third passenger produced a Washington State identification card (ID).

¶9 Sergeant Hamilton asked Moore how she could reach Morris. Moore told her that Morris had no telephone at his home.

¶10 Sergeant Hamilton then ran the information from the three passengers through her computer and determined that the information provided by Moore and the woman

driver was inaccurate. The female driver was also listed as "missing/endangered," and had two outstanding arrest warrants.

¶11 The search results for the name Moore had provided, "Kenneth Black," showed that this was an alias for "Alex Moore." The results also showed that he had an outstanding felony warrant and included information about identifying tattoos on Alex Moore's forearms.

¶12 Sergeant Hamilton called for backup. She asked Moore and the other passengers to step out of the car and sit on the curb, which they did. A responding officer arrived and demanded that Moore, as the subject of the outstanding warrant, roll up his long sleeves to verify his identity through tattoos on his forearms. The officers checked the tattoos, confirming Moore's identity, and placed him under arrest on the basis of the outstanding felony warrant. Moore then gave his true name and birth date. In a search incident to arrest, the officers discovered a bottle containing Diazepam pills.

¶13 Based on the results of the computer search, police also arrested the driver on her outstanding warrants.

¶14 The State charged Moore with one count of possession of a controlled substance. At a bench trial, Moore moved to suppress the pills on the grounds that the search and seizure of Moore exceeded the scope of permissible action under the community caretaking exception to the warrant requirement. The trial court denied the motion to suppress and convicted Moore based on stipulated facts. The court sentenced him to a standard range sentence of 13 months.

¶15 Moore appeals, and the State cross-appeals.

## SUPPRESSION HEARING FINDINGS

¶16 Moore assigns error to certain of the trial court's factual findings in its suppression order.[9] In its cross-appeal, the State assigns error to the portion of finding of fact P that states: "Kahler rolled up the defendant's sleeves so he could examine his arms for tattoos."

¶17 In reviewing findings of fact on a motion to suppress, this court " 'will review only those facts to which error has been assigned.' "[10] The trial court's findings of fact are presumed correct and the party assigning error to those findings bears the burden of proving that the findings are not supported by the record.[11]

¶18 Generally, findings are viewed as verities on appeal, provided there is substantial evidence to support them.[12] Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.[13]

---

[9] On appeal, Moore challenges the emphasized portions of the findings of fact:

C. As part of the information provided by the computer, Morris was listed as a missing or endangered person from the Seattle area. This phrase is not a term of art and could have several different meanings. *Hamilton was unable to determine anything about Morris' status or the reason for it. She was provided no physical description for Morris.*

. . . .

G. *Hamilton explained the reason for the stop and asked the remaining passengers their names to determine whether or not any of them were Robert Morris.*

. . . .

P. *All of the parties stepped out of the vehicle.* Soon thereafter, Officer Kahler of the Mill Creek Police Department arrived on the scene. Kahler rolled up the defendant's sleeves so he could examine his arms for tattoos. The defendant was wearing long sleeves. The defendant testified that he did not voluntarily submit to this search. Kahler examined the tattoos on the defendant's body and after careful examination used the tattoos to match the defendant with his real name.

Q. *The request of Officer Kahler to examine the tattoos did not take an unreasonable amount of time.* (Conclusion of law) B. *In order to determine if Mr. Morris was in the car, she asked everyone to identify themselves.*

[10] *Acrey*, 148 Wn.2d at 745 (quoting *Kinzy*, 141 Wn.2d at 382).

[11] *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990).

[12] *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

[13] *Hill*, 123 Wn.2d at 644.

¶19 Moore presents no argument to substantiate the absence of substantial evidence to support the challenged findings. For example, Moore challenges the court's finding that "Hamilton was unable to determine anything about Morris' status or the reason for it," but fails to show lack of substantial evidence. There is no dispute that Sergeant Hamilton "was provided no physical description for Morris." Likewise, there is substantial evidence, from Hamilton's testimony, to support the finding that Hamilton asked for identification to determine if Morris was in the car.

¶20 We conclude that substantial evidence in the record supports the findings of fact Moore challenges.

¶21 In contrast, the finding the State appeals is not supported by the record. The only testimony in the record regarding rolling up Moore's sleeves came from Moore himself. He testified that he unwillingly rolled up his own sleeves because the officer told him to "show [the police] your forearms or we can—or I can make you show me your forearms."

¶22 For purposes of our analysis, whether Officer Kahler rolled up Moore's sleeves or forced Moore to roll up his own sleeves is an irrelevant distinction. Neither party in this appeal persuasively argues otherwise.

COMMUNITY CARETAKING FUNCTION EXCEPTION

¶23 Moore argues that the officer's request for his iden-tification exceeded the scope of the community caretaking exception to the warrant requirement. We disagree.

¶24 Generally, under both the fourth amendment to the United States Constitution and article I, section 7 of the Washington Constitution, a police officer's seizure of a criminal suspect must be supported by a judicial warrant based on probable cause.[14] A warrantless seizure is pre-sumed unreasonable, and therefore in violation of both the

---

[14] *Acrey,* 148 Wn.2d at 745-46; *State v. Ladson,* 138 Wn.2d 343, 349, 979 P.2d 833 (1999).

federal and state constitutions, unless the State shows that it falls within one of the exceptions to the warrant requirement.[15]

¶25 A well-recognized exception to the Fourth Amendment requirement for a warrant is "community caretaking."[16] In Washington, the " 'community caretaking function' exception to the warrant requirement encompasses the 'not only "search and seizure" of automobiles, but also situations involving either emergency aid or routine checks on health and safety.' "[17] In the case of routine checks on health and safety, the proper determination is whether an officer's encounter with a person is reasonable, a determination based on balancing the " 'individual's interest in freedom from police interference against the public's interest in having the police perform a "community caretaking function." ' "[18] "Even a routine stop for a safety check, if it involves a 'seizure' by detaining, must be necessary and strictly relevant to performance of the non-criminal investigation."[19] " 'The noncriminal investigation must end when reasons for initiating an encounter are fully dispelled.' "[20] Courts must " 'cautiously apply the community caretaking function exception because of a real risk of abuse in allowing even well-intentioned stops to assist.' "[21]

---

[15] *Acrey*, 148 Wn.2d at 745-46; *Kinzy*, 141 Wn.2d at 384.

[16] *Acrey*, 148 Wn.2d at 749-50.

[17] *Acrey*, 148 Wn.2d at 749-50 (quoting *Kinzy*, 141 Wn.2d at 386).

[18] *Acrey*, 148 Wn.2d at 750 (quoting *Kinzy*, 141 Wn.2d at 387). In contrast, the emergency aid function "involves circumstances of greater urgency and searches resulting in greater intrusion. It applies when '(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched.' "; *Kinzy*, 141 Wn.2d at 386-87 (footnotes omitted) (quoting *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994)).

[19] *Acrey*, 148 Wn.2d at 750.

[20] *Acrey*, 148 Wn.2d at 750 (quoting *Kinzy*, 141 Wn.2d at 388).

[21] *Acrey*, 148 Wn.2d at 750 (quoting *Kinzy*, 141 Wn.2d at 388).

¶26 Community caretaking is totally divorced from a criminal investigation.[22] Whether community caretaking is also an exception to article I, section 7 has not been explicitly addressed by our Supreme Court.[23] Whether a stop incident to "community caretaking" is "reasonable" requires balancing " 'the competing interests involved in light of all the surrounding facts and circumstances,' "[24] particularly the " 'individual's interest in freedom from police interference against the public's interest in having the police perform a community caretaking function.' "[25]

¶27 To avoid potential abuse, courts cautiously apply this exception. Accordingly, a routine safety check must (1) be necessary and strictly relevant to the community caretaking function and (2) end when reasons for initiating an encounter are fully dispelled.[26]

### Balancing of Individual's and Public's Interest

¶28 We begin our consideration whether police action was reasonable in this case by applying the proper balancing test. To determine the reasonableness of the police intrusion here, we consider the totality of the circumstances.[27]

¶29 Moore does not dispute that there is a significant public interest in having police perform the community caretaking function of locating a person listed in an official database as "missing/endangered." Indeed, this court has previously observed that when "an officer believes in good faith that someone's health or safety may be endangered . . . public policy does not demand that the

---

[22] *Kinzy*, 141 Wn.2d at 385.

[23] *Kinzy*, 141 Wn.2d at 386 n.38.

[24] *Acrey*, 148 Wn.2d at 748-49 (quoting *State v. Chisholm*, 39 Wn. App. 864, 867, 696 P.2d 41 (1985)).

[25] *Acrey*, 148 Wn.2d at 750 (quoting *Kinzy*, 141 Wn.2d at 387).

[26] *Acrey*, 148 Wn.2d at 750 (quoting *Kinzy*, 141 Wn.2d at 388).

[27] *Acrey*, 148 Wn.2d at 753.

officer delay any attempt to determine if assistance is needed and offer assistance while a warrant is obtained."[28] This court further stated that "the officer could be considered derelict by *not* acting promptly to ascertain if someone needed help."[29]

¶30 Here, Sergeant Hamilton ran a computer check on the license plate number of a vehicle that had almost collided with her vehicle. She learned from the database that the car was registered to Robert Morris, who was listed as a missing/endangered person. The data did not include any physical description of Morris. Based on the information she then had, she stopped the vehicle registered to Morris. Sergeant Hamilton testified at the suppression hearing that she stopped the vehicle to determine whether Morris was in the car, to notify him that he was reported missing/endangered, and to check on his well-being.

¶31 The stop of the car was necessary and strictly relevant to a noncriminal investigation to determine whether Morris, a person reported as missing/endangered, was in the car. The State has a significant interest in conducting a routine health and safety check, a noncriminal investigation. We weigh that interest against Moore's interest in freedom from police interference.[30] In striking that balance, we hold that the police action in stopping the car was reasonable.

¶32 At the suppression hearing, Sergeant Hamilton further testified that after stopping the vehicle she identified herself and "explained [to the occupants] the reason for the stop." She asked the passengers if any of them was Robert Morris, the person reported as missing/endangered. They said they were not. Moore stated that they had borrowed the car from Morris, who was at his house waiting for them.

---

[28] *State v. Gocken*, 71 Wn. App. 267, 276, 857 P.2d 1074 (1993).

[29] *Gocken*, 71 Wn. App. at 276.

[30] *Kinzy*, 141 Wn.2d at 389 (preseizure interest in freedom from police interference is minimal).

¶33 Because she did not have a physical description for Morris, she asked for identification. Everyone except one of the male passengers provided a verbal response to the request. The front passenger, who was later identified as Alex Moore, said that his name was "Kenneth Black" and gave a false date of birth. Another male passenger provided a Washington State ID.

¶34 Based on *State v. Rankin*,[31] Moore argues that the request for his identification constituted a seizure. We agree.

¶35 He further argues that Sergeant Hamilton could have determined whether or not Morris was in the car by obtaining a physical description of Morris from Department of Licensing (DOL) records. He claims that obtaining identification from him was neither necessary nor strictly relevant to fulfilling the community caretaking function and therefore unreasonable. We disagree.

¶36 This record does not show whether DOL records would have revealed any information about Morris. Nevertheless, Sergeant Hamilton's choice to ask for identification of those in a car registered to Morris was reasonable under the circumstances. She testified that she had hoped that if Morris was in the car, he would have identification on him. She could have then advised him of his reported missing/ endangered status and could have asked him to contact his family. A brief detention to determine whether Morris was in his car, rather than a more lengthy detention while Sergeant Hamilton checked for what information about him *might* be in DOL records, was a reasonable choice.

¶37 Moore also challenges on appeal Sergeant Hamilton's decision to continue with her investigation although neither Moore nor any of the other passengers appeared to be distressed or endangered. Sergeant Hamilton alluded to the case of Elizabeth Smart. She

---

[31] 151 Wn.2d 689, 92 P.3d 202 (2004) (holding that automobile passengers are illegally detained under the state constitution when an officer requests identification following a stop of a vehicle unless other circumstances give the officer independent cause to question the passengers).

indicated that Smart, a 15-year-old kidnapping victim, appeared in public with her kidnappers and did not appear to be missing and endangered before her rescue. Sergeant Hamilton made the analogy here that Morris could have been in the car with the other occupants, being held against his will. She also testified that, having learned that she had no way to contact Morris, she was concerned by the explanation that Morris was "back at the house" because "I didn't know if he was in a shallow grave someplace." Continuation of the noncriminal investigation to check on the health and safety of Morris was reasonable.

¶38 However, the seizure raises another important issue. A seizure during a routine check on health and safety does not, by itself, determine whether police intrusion on an individual's liberty interest is unreasonable. But it does require that we apply the proper balancing test because of a change in the interest in freedom from police intrusion of the person seized.[32] As the *Kinzy* court observed, at the point of the seizure, "[Moore's] interest in being free from police intrusion was no longer minimal."[33]

¶39 At the suppression hearing, Sergeant Hamilton testified that she asked how she might contact Morris based on Moore's response that Morris was back at his house. Moore replied that Morris had no telephone.

¶40 Sergeant Hamilton testified that at that point she wanted to determine whether the information Moore and the others had given her could be verified. She returned to her vehicle to run the names and dates of birth she had been given. She expressly testified that her purpose in doing so was noncriminal. Sergeant Hamilton also expressly testified that had she obtained information that Morris was white, she would not have continued her encounter with the occupants of the car, all of whom were black.

---

[32] *Kinzy*, 141 Wn.2d at 390.

[33] *Kinzy*, 141 Wn.2d at 390.

¶41 When she ran the names and birth dates, the search results for Kenneth Black, the name Moore gave her, revealed that it was an alias for Alex Moore, the subject of an outstanding felony warrant.

¶42 While still at her vehicle, Sergeant Hamilton also contacted the Seattle detective division that issued the missing/endangered persons report to obtain further information about Morris and the reason for his reported status. She was unable to obtain further information.

¶43 At this point, Sergeant Hamilton called for backup, returned to the vehicle registered to Morris, and asked the occupants to step out of the car. We describe later in this opinion the events that followed.

¶44 After applying the appropriate balancing tests to the stages of the encounter between the police and Moore, we conclude that Sergeant Hamilton properly conducted a routine check on health and safety under the community caretaking function. Sergeant Hamilton testified extensively that she believed Morris needed assistance, based on his reported missing/endangered status. The stop of the vehicle registered to him was proper.

¶45 The subsequent seizure and continuation of the noncriminal investigation were also proper. While the interest of Moore was substantial after he was seized, that interest did not outweigh the State's substantial interest in properly performing the community caretaking function.

¶46 This case is distinguishable from *State v. Kinzy*.[34] There, police stopped a 16-year-old girl after seeing her walking on a downtown Seattle sidewalk at about 10 P.M. on a weeknight with an adult male the officer knew from previous contacts to be involved with narcotics.[35] When Kinzy tried to walk away, the officer physically detained her and a later search revealed cocaine. The Supreme Court held that, under the community caretaking exception, police could approach Kinzy and ask if she needed help. But

[34] 141 Wn.2d 373, 5 P.3d 668 (2000).

[35] *Kinzy*, 141 Wn.2d at 378.

without articulable suspicion that she had committed a criminal offense, they could not physically detain her when she chose to walk away.[36] The police's legitimate reason for stopping Kinzy ended once they determined she was not in need of assistance.[37]

¶47 The court noted that, having stopped Kinzy in order to determine if she needed assistance, the police officer's action in grabbing Kinzy's arm made the community caretaking function appear to be pretextual—it was "suggestive of enforcement of a juvenile curfew law. But Seattle does not have such a law."[38]

¶48 Here, the status of Morris—a reported missing/ endangered person—was unclear throughout the encounter between police and Moore. Sergeant Hamilton had no way of confirming that Morris did not need assistance. Significantly, there was no suggestion here of enforcement of any law like the *Kinzy* case. Rather, the actions of the police to the point of obtaining search results indicating that Moore was the subject of an outstanding felony warrant were "necessary and strictly relevant to performance of the noncriminal investigation."[39] The police were entitled to attempt to fully dispel the concerns about Morris before ceasing the noncriminal investigation into Morris' whereabouts and safety.

¶49 In *State v. Acrey*, police responded to a citizen's weeknight 911 call reporting fighting, and found five young boys, including 12-year-old Acrey, out after midnight in an isolated area with no adult supervision.[40] Police contacted Acrey's mother, who asked police to give the boy a ride home.[41] Before transporting the boy in the police car, police

---

[36] *Kinzy*, 141 Wn.2d at 395.

[37] *Kinzy*, 141 Wn.2d at 395.

[38] *Kinzy*, 141 Wn.2d at 391.

[39] *Acrey*, 148 Wn.2d at 750.

[40] *Acrey*, 148 Wn.2d at 742-43.

[41] *Acrey*, 148 Wn.2d at 743.

conducted a pat-down frisk for safety purposes and found drugs.[42]

¶50 The Supreme Court affirmed the appellate court's holding that there was reason for heightened concern that the boys might be engaging in conduct that could bring harm to themselves or others and that the police acted reasonably.[43] The court distinguished *Kinzy*, pointing to the most important factor in the reasonableness determination: the fact that a 911 call had been placed raised at least some degree of concern for Acrey's well-being, regardless of whether there was any criminal activity.

¶51 Similarly here, Sergeant Hamilton stopped the car because its registered owner was listed as missing/endangered. She pursued her noncriminal investigation to the point of receiving information that she was likely talking to someone who had given false information in response to her questions and who was likely the subject of an outstanding felony warrant.

¶52 We conclude that the police validly exercised the community caretaking function to the point of receiving information that suggested a criminal investigation was necessary. The valid exercise of the function is a proper exception to the general requirement for a warrant.

## EXAMINATION OF MOORE'S FOREARMS FOR TATTOOS

¶53 Moore next argues that the officers' demand that he expose his forearms, so that they could verify his identity using his tattoos, violated the fourth amendment to the United States Constitution and article I, section 7 of the Washington State Constitution.[44] We disagree.

---

[42] *Acrey*, 148 Wn.2d at 743.

[43] *Acrey*, 148 Wn.2d at 751.

[44] Article I, section 7 provides that "no person shall be disturbed in his private affairs . . . without authority of law."

¶54 When analyzing police-citizen interactions, this court determines whether a warrantless search has taken place and, if it has, whether the action was justified by an exception to the warrant requirement.[45]

¶55 A *Terry*[46] stop is among the exceptions to the constitutional warrant requirement. Such stops permit a police officer to conduct an investigative detention based upon less evidence than is needed for probable cause to make an arrest.[47] "A brief investigative stop is permissible whenever the police officer has a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime."[48]

¶56 In *State v. Acrey*,[49] the Supreme Court analyzed whether the police encounter with the child in that case was reasonable. While conducting the community caretaking function, police conducted a pat-down search of the child prior to placing him in the patrol car to return him to his mother, as she requested. The court noted that such a search was reasonable, citing *State v. Wheeler*.[50]

¶57 Taking our lead from the Supreme Court, we too look to *Wheeler* for guidance. There, the Supreme Court identified three factors courts use in determining whether police intrusion on an individual is reasonable under *Terry*: "(1) the purpose of the stop; (2) the amount of physical intrusion upon the suspect's liberty; and (3) the length of time the suspect is detained."[51] "A lawful *Terry* stop is limited in scope and duration to fulfilling the

---

[45] *Rankin*, 151 Wn.2d at 695.

[46] 392 U.S. 1.

[47] *Acrey*, 148 Wn.2d at 746-47.

[48] *Acrey*, 148 Wn.2d at 747 (citing *United States v. Hensley*, 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)).

[49] 148 Wn.2d 738.

[50] 108 Wn.2d 230, 737 P.2d 1005 (1987).

[51] *Wheeler*, 108 Wn.2d at 235 (citing *State v. Williams*, 102 Wn.2d 733, 740, 689 P.2d 1065 (1984)).

investigative purpose of the stop."[52] In *State v. Smith*,[53] our Supreme Court stated that when "doubt as to the correct identity of the subject of [a valid arrest] warrant arise[s], the arresting officer ... [must] *make immediate reasonable efforts* to confirm or deny the applicability of the warrant to the detained individual."[54]

¶58 For purposes of our analysis we assume, without deciding, that Moore had a privacy interest in his forearms and that exposing the tattoos was therefore a search. We have already held in this opinion that the police demanded that he show his forearms after receiving information that an Alex Moore, the subject of a felony warrant, had tattoos there.

¶59 We have already decided that police were validly exercising a community caretaking function to the point when the noncriminal purpose of the investigation changed to a criminal one: verification whether Moore was the person named in the outstanding felony warrant.

¶60 *State v. Wheeler*[55] dealt with the permissibility of transporting a suspect to a "show-up" for identification purposes. In *Wheeler*, the challenge to the procedures was also based on the Fourth Amendment and article I, section 7.[56] Police were investigating a suspected burglary and found Wheeler nearby.[57] His clothing matched the description given by a witness. The police asked Wheeler no questions except his name. They told him he was being held in custody on suspicion of burglary, frisked and handcuffed him, and placed him in the patrol car. They then drove him two blocks back to the crime scene in order to permit a

---

[52] *Acrey*, 148 Wn.2d at 747.

[53] 102 Wn.2d 449, 453-54, 688 P.2d 146 (1984).

[54] *Smith*, 102 Wn.2d at 454 (emphasis added).

[55] 108 Wn.2d 230.

[56] *Wheeler*, 108 Wn.2d at 234.

[57] *Wheeler*, 108 Wn.2d at 232-33.

witness to identify him.[58] The time from detention to identification was from 5 to 10 minutes.[59]

¶61 The *Wheeler* court found that the "amount of physical intrusion in [that] case was 'significant'."[60] Nonetheless, the court found it permissible under *Terry*.[61] The court found two factors to be determinative: the fact that the police knew a crime had been committed and that the detention was brief.

¶62 As in *Wheeler*, the police in this case knew, by virtue of the outstanding felony warrant, that a crime had been committed. The detention and search of Moore was aimed, as was the transport in *Wheeler*, at confirming the detained individual's identity. And the investigatory detention of Moore took no more than 5 to 10 minutes. Moreover, in comparison with the handcuffing, frisking, and transporting of Wheeler, the level of intrusion here, detaining Moore to examine the tattoos on his forearms, was less than in that case. While tattoos may appear on more private areas of the body, that is not the case here. Thus, we are not required to decide in this case what limits exist for a more invasive search.

¶63 We hold that, under the circumstances of this case, the scope of a permissible *Terry* stop was not exceeded. The examination of Moore's forearms violated neither the Fourth Amendment nor article I, section 7.

## INEVITABLE DISCOVERY

¶64 Moore finally contends that the search was illegal and that the evidence cannot be admitted under the inevitable discovery rule. Because we hold that the search was valid and the evidence admissible, we need not reach this argument.

---

[58] *Wheeler*, 108 Wn.2d at 235.

[59] *Wheeler*, 108 Wn.2d at 233.

[60] *Wheeler*, 108 Wn.2d at 235.

[61] *Wheeler*, 108 Wn.2d at 235.

¶65 Moore does not otherwise challenge the search incident to his arrest. It was a valid search, and the court properly denied the motion to suppress the drugs the police discovered during that search.

¶66 We affirm the judgment and sentence.

COLEMAN, J., concurs.[62]

Review denied at 157 Wn.2d 1007 (2006).

---

[62] Judge Kennedy had indicated her concurrence prior to her death on September 16, 2005. *State v. Carey*, 42 Wn. App. 840, 857, 714 P.2d 708 (1986); *Gibson v. City of Auburn*, 50 Wn. App. 661, 671, 748 P.2d 673 (1988).