IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31608-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN WILLIAM WALLACE JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — John William Wallace Jr. appeals his conviction of unlawful possession of a controlled substance. He argues that methamphetamine found in his pocket, resulting in the charge, was discovered in a search incident to an unlawful arrest and, alternatively, that the arrest was the result of an unlawful detention. He also argues that the State failed to present evidence of prior convictions supporting the offender score relied upon by the sentencing court and that he is entitled to be resentenced.

We affirm his conviction but agree that Mr. Wallace is entitled to remand for resentencing, although with an opportunity for the State to present evidence of Mr. Wallace's criminal history.

FACTS AND PROCEDURAL BACKGROUND

On October 19, 2012, the Benton County Sheriff's Office was contacted by Linda Wallace-Lincoln, who asked that deputies do a welfare check on her son, John William Wallace Jr., based on a report to her that he might be suicidal and overdosing on drugs in a trailer in rural Benton County. She stated that the trailer was condemned and uninhabitable, and that no one was supposed to be staying there.

Deputy Jean-Paul Benitez and his partner traveled to the address given and located a small pull trailer, where they saw Mr. Wallace at the doorway. When they made eye contact, he stepped back inside. Mr. Wallace was wearing jeans but no shirt and they could see that he had cuts and blood on his knuckles. He was moving around, "spin[ning] around in uncontrollable motions with the limbs and the body," a behavior that the deputy referred to at trial as "tweaking out," and that he had learned was indicative of being under the influence of some type of stimulant. Report of Proceedings (RP) at 28. When the deputies asked Mr. Wallace to step out of the trailer, he did so with "much difficulty." Clerk's Papers (CP) at 24. The deputy contacted dispatch and asked that medics be sent to the trailer location.

While awaiting the arrival of medics, the deputy noticed that one of the trailer's side windows had been smashed and asked Mr. Wallace about it. Mr. Wallace told the deputy that he had been sleeping when a sharp pain in his side caused him to jump and, upset at the pain, he punched out the window.

2

When medics arrived, they bandaged Mr. Wallace's injured knuckles. They asked Mr. Wallace what he had been taking, to which he responded that he had taken nothing and that he was fine. Mr. Wallace refused further medical treatment, stated that he was not trying to hurt himself or anyone else, and "that he just wanted to go . . . back to bed." *Id.*

After the medics left, Deputy Benitez called Ms. Wallace-Lincoln, as the "original reporting party," to "let her know the status of her son and just basically give her disposition of what we found so far on the property and his condition that we observed." RP at 31. When Ms. Wallace-Lincoln learned that Mr. Wallace was indeed at the trailer and had broken a window, she told the deputy that she wanted her son charged with malicious mischief for damaging the trailer. She told the deputy that Mr. Wallace had repeatedly ignored her instructions to stay away from the property and that she had previously screwed the trailer doors shut—a claim that was consistent with the deputy's observation that the trailer door appeared to have been secured at one point but then forced open.

According to Deputy Benitez's contemporaneous police report, "After speaking with Linda, I re-contacted John." CP at 24. The deputy advised Mr. Wallace that his mother had stated he was not supposed to be on the property. Mr. Wallace claimed that the trailer was "technically" his and his brother's, that it had not been secured when he arrived, and that he had not forced his way in. *Id.* Deputy Benitez again called Ms.

3

Wallace-Lincoln, who insisted that the trailer had been left on the property by one of her acquaintances, that she was the "responsible owner" of the property and trailer, and that Mr. Wallace had no stake or claim to it. *Id.*

Based on Ms. Wallace-Lincoln's representation that she was the responsible owner, Mr. Wallace's admission that he had broken the window, and the deputy's own observation of Mr. Wallace's injured knuckles and blood on the outside of the door to the trailer as well as around the shattered window, Deputy Benitez arrested Mr. Wallace for malicious mischief. When he conducted a search of Mr. Wallace incident to the arrest, he found a small baggie containing a white crystalline substance in Mr. Wallace's front pants pocket. It field tested positive for methamphetamine.

Mr. Wallace was charged with unlawful possession of a controlled substance and third degree malicious mischief. He moved to suppress the methamphetamine, relying on Deputy Benitez's police report. While conceding that the deputy's initial contact with him was justified as community caretaking, Mr. Wallace argued that the detention exceeded the community caretaking function when the deputy continued to investigate after Mr. Wallace was treated for his injured knuckles and refused further care. The motion was denied.

A jury found Mr. Wallace not guilty of the malicious mischief charge but guilty of possession of a controlled substance. Based on an offender score of five, he was sentenced to a year and a day in custody. He appeals.

4

ANALYSIS

Mr. Wallace contends that (1) probable cause did not exist for Deputy Benitez to arrest him, (2) the detention was not lawful under the community caretaking exception, and (3) the evidence was insufficient to support his offender score. We address the claimed errors in turn.

### I. *Was the search incident to an unlawful arrest?*

A search incident to arrest is one of the few specifically established and well-delineated exceptions to the warrant requirement, derived from interests in officer safety and evidence preservation that are typically implicated in arrest situations. *State v. MacDicken*, 179 Wn.2d 936, 943, 319 P.3d 31 (2014) (Gordon McCloud, J., dissenting) (quoting *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)). Only a lawful custodial arrest provides authority to search incident to arrest under article I, section 7 of the Washington Constitution. *State v. O'Neill*, 148 Wn.2d 564, 585, 62 P.3d 489 (2003). The lawfulness of an arrest stands on the determination of whether probable cause supports the arrest. *State v. Moore*, 161 Wn.2d 880, 885, 169 P.3d 469 (2007). Mr. Wallace contends that Deputy Benitez lacked probable cause to arrest him for malicious mischief in light of the conflicting information the deputy had received about ownership of the trailer.[1]

---

[1] The State analyzes the facts under RCW 10.31.100, which governs whether a police officer having probable cause to believe that a person has committed a crime may

Probable cause for arrest exists where an officer knows of circumstances that would lead a reasonably cautious person to believe that the suspect has committed a crime. *State v. Terrovona*, 105 Wn.2d 632, 643, 716 P.2d 295 (1986). Probable cause is not knowledge of evidence sufficient to establish guilt beyond a reasonable doubt but, rather, is "reasonable grounds for suspicion coupled with evidence of circumstances to convince a cautious or disinterested person that the accused is guilty." *State v. Bellows*, 72 Wn.2d 264, 266, 432 P.2d 654 (1967). We determine whether an arresting officer's belief was reasonable after considering all the facts within the officer's knowledge at the time of the arrest as well as the officer's special expertise and experience. *State v. Fricks*, 91 Wn.2d 391, 398, 588 P.2d 1328 (1979).

Deputy Benitez's basis for arresting Mr. Wallace was largely information provided by Ms. Wallace-Lincoln. In determining whether information provided by a citizen informant furnishes probable cause for an arrest, we look to the *Aguilar-Spinelli*[2] test, which recognizes that an informant's information can furnish probable cause for

---

arrest him or her without a warrant. Mr. Wallace does not challenge the absence of a warrant for his arrest, likely because Mr. Wallace's admitted breaking of the window constituted "physical harm . . . to . . . property," which would support a warrantless arrest under RCW 10.31.100(1). We will not address this issue further, since it is not the basis of any assignment of error or argument by Mr. Wallace.

[2] *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). Both *Aguilar* and *Spinelli* were abrogated by *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), but adhered to by *State v. Jackson*, 102 Wn.2d 432, 688 P.2d 136 (1984).

arrest if the State establishes (1) the basis of the informant's information and (2) the credibility of the informant or the reliability of the informant's information. *State v. Gaddy*, 152 Wn.2d 64, 71-72, 93 P.3d 872 (2004). In applying the second prong, if the identity of an informant is known (as opposed to being anonymous or professional) the necessary showing of reliability is relaxed, due to the lessened risk that the information is rumor or irresponsible conjecture. *Id.* at 72. Citizen informants are deemed presumptively reliable. *Id.* at 73.

In this case, the deputy had a number of reasons for deeming Ms. Wallace-Lincoln's information reliable, even though it later appeared that she had overstated her interest in the property. Before the date of her request for the welfare check and the arrest, Deputy Benitez had participated in an earlier call with Ms. Wallace-Lincoln, in which she was requesting information from the sheriff's department about the legal steps required to get her son off the property. He was aware that she had been provided with information on the process, even though she had not followed it. He knew that Ms. Wallace-Lincoln was the defendant's mother, and that the original purpose of her call had been a request for a welfare check. Ms. Wallace-Lincoln's information had proved reliable; Deputy Benitez and his partner found Mr. Wallace at the trailer, high on some unknown substance, just as Ms. Wallace-Lincoln had anticipated he would be. Her claim that the trailer had been secured with screws was consistent with the deputy's observation

7

that the door appeared to have been formerly screwed into the doorframe but then forced open.

Mr. Wallace, on the other hand, did not inspire belief. His explanation that he broke the window and cut his knuckles when he punched out the window in anger was a bizarre response to being awakened by acute side pain. He told medics he had taken nothing and was fine while visibly "tweaking out." RP at 28. When told of Ms. Wallace-Lincoln's accusation that he was not allowed on the premises, Mr. Wallace initially stated he was homeless and had nowhere else to go; it was only when told that his mother wished to press criminal charges that he claimed that the trailer was "technically" his and his brother's. CP at 24.

Given Ms. Wallace-Lincoln's reasonably perceived credibility as the owner or person responsible for the trailer and Mr. Wallace's admission that he had broken the window, the deputy had probable cause to arrest him for malicious mischief.

*II. Was the arrest the result of an unlawful detention?*

Mr. Wallace concedes that the deputy's travel to the property and initial detention was justified by the community caretaking exception to the warrant requirement, but argues that the community caretaking function ended when the medics advised Deputy Benitez that nothing further could be done unless Mr. Wallace sought medical treatment, which he refused. He argues that the deputy should have ended his encounter with Mr. Wallace at that point but instead continued to detain Mr. Wallace.

8

The State responds that Deputy Benitez's contact with Mr. Wallace was initially lawful under the community caretaking exception and, based on what the deputy observed, continuing contact was justified as a valid *Terry*[3] detention for suspicion of criminal trespass and malicious mischief.

When the community caretaking exception to the warrant requirement applies, "police officers may conduct a noncriminal investigation so long as it is necessary and strictly relevant to performance of the community caretaking function." *State v. Kinzy*, 141 Wn.2d 373, 388, 5 P.3d 668 (2000). "The noncriminal investigation must end when reasons for initiating an encounter are fully dispelled." *Id.* The community caretaking function must not be used as a pretext for an evidentiary search of criminal activity. *State v. Schlieker*, 115 Wn. App. 264, 270, 62 P.3d 520 (2003).

A *Terry* stop permits officers to briefly detain a person for questioning without grounds for arrest if they reasonably suspect, based on "specific, objective facts" that the person detained is engaged in criminal activity or a traffic violation. *State v. Day*, 161 Wn.2d 889, 896, 168 P.3d 1265 (2007). A stop should be minimally intrusive so that the seizure is "'reasonably related in scope to the justification for its initiation.'" *State v. Armenta*, 134 Wn.2d 1, 16, 948 P.2d 1280 (1997) (internal quotation marks omitted) (quoting *State v. Kennedy*, 107 Wn.2d 1, 17, 726 P.2d 445 (1986) (Dolliver, C.J.,

---

[3] *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

dissenting)). "[T]he scope of a permissible *Terry* stop will vary with the facts of each case, but . . . it is 'clear' that *Terry* requires that an investigative detention must be temporary, lasting no longer than is necessary to effectuate the purpose of the stop." *State v. Williams*, 102 Wn.2d 733, 738, 689 P.2d 1065 (1984) (citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)).

In evaluating the lawfulness of a *Terry* stop, we inquire whether the temporary seizure was justified at its inception, and whether it was reasonably related in scope to the circumstances that justified the initial interference. *Williams*, 102 Wn.2d at 739.

In some cases, what begins as a noninvestigative detention under the community caretaking function can evolve into an investigative detention. *State v. Moore*, 129 Wn. App. 870, 874-75, 120 P.3d 635 (2005). In *Moore*, an officer stopped a vehicle that was registered to an owner who was reported "'missing/endangered.'" *Id.* at 874. The officer briefly detained the driver and passengers for the community caretaking purpose, during which her interaction with one of the passengers led her to suspect that he was the subject of an outstanding felony warrant. *Id.* After the officer verified his identity through the alias he gave police and distinctive tattoos on his forearms, he was arrested and searched, which revealed his possession of a controlled substance. *Id.* The court recognized that the entire detention could not be justified as community caretaking but, given the seamless introduction of a separate and valid basis for detention, it held that the detention, resulting arrest, and search were all lawful. *Id.* at 874-75.

10

In this case, we question as an initial matter whether the record supports Mr. Wallace's implicit contention that he was "detained" after the medics left. Mr. Wallace had no interest in leaving the trailer's location; he told Deputy Benitez that he had been sleeping in the trailer before the deputies arrived and wanted to go back to bed—so the deputy was not preventing Mr. Wallace from going anywhere. Indeed, while the record is not entirely clear, the deputy's police report suggests that Mr. Wallace might have gone back inside the trailer while the deputy called Ms. Wallace-Lincoln to report on her son's condition. The police report states that after the deputy spoke with Ms. Wallace-Lincoln on the telephone, "I re-contacted John." CP at 24.

In any event, just as in *Moore*, the constitutionally permissible community caretaking contact lasted long enough for the deputy to observe the broken window at a trailer that the deputy knew Ms. Wallace-Lincoln had undertaken to trespass her son from in the past, and that she had described to dispatch as condemned and off-limits. He was told by Mr. Wallace before the medics completed their care that he had punched out the trailer's window. These specific and articulable facts gave rise to a reasonable suspicion that Mr. Wallace had engaged in criminal activity. The additional detention lasted only as long as it took for the deputy to speak further with Ms. Wallace-Lincoln on the telephone and examine the trailer further. Mr. Wallace's brief detention following his refusal of further medical assistance—if there was a detention—was reasonable under *Terry*.

11

### III. Offender score.

Finally, Mr. Wallace argues that at the time of sentencing the State presented no evidence of his prior convictions, with the result that his offender score should have been 0, leading to a standard range of 0-6 months. The State concedes that it did not present sufficient evidence of the prior convictions and that Mr. Wallace's conduct did not amount to a waiver of the issue, but it points out that Mr. Wallace did not object in the trial court. It concedes that the case should be remanded. The only point of contention is whether Mr. Wallace's offender score should be "zero" on remand as a result of the State's failure to meet its burden, as Mr. Wallace contends, or whether—as the State argues—it should be given the opportunity to present evidence of Mr. Wallace's past convictions.

*State v. Mendoza*, 165 Wn.2d 913, 930, 205 P.3d 113 (2009) is controlling, and holds:

> When a defendant raises a specific objection at sentencing and the State fails to respond with evidence of the defendant's prior convictions, then the State is held to the record as it existed at the sentencing hearing. But where . . . there is no objection at sentencing and the State consequently has not had an opportunity to put on its evidence, it is appropriate to allow additional evidence at sentencing.

(Citation omitted.) Here, as in *Mendoza*, Mr. Wallace made no specific objections and the sentencing court had no opportunity to correct any error. We therefore remand with a full opportunity for the State to prove Mr. Wallace's criminal history at resentencing.

12

We affirm the conviction and remand for further proceedings consistent with this opinion.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Brown, J.

Lawrence-Berrey, J.