IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82749-9-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| ABDULKADIR GARGAR, | |
| Appellant. | |

SMITH, C.J. — Abdulkadir Gargar asserts that he was unconstitutionally seized when an officer blocked his running car into its parking spot after observing him unconscious in the driver's seat. Gargar was prohibited by a previous court order from possessing a firearm but upon a search of his person and car, officers discovered a firearm and ammunition. A jury found Gargar guilty of unlawful possession of a firearm in the first degree. Gargar appeals, contending the trial court erred by concluding that Gargar was constitutionally seized when his car was blocked in by a patrol vehicle.

Because Gargar was constitutionally seized pursuant to the community caretaking exception to warrantless seizures, we affirm.

FACTS

On the morning of June 23, 2020, Officer Daniel Brom was conducting a routine patrol in the parking lot of the Sunset Motel in Kent, Washington, known to be a high-crime area. Noticing Abdulkadir Gargar in a car, apparently asleep,

Officer Brom stopped his patrol vehicle to exit and check on Gargar. Gargar's car was backed in to a parking spot on an incline, with its front angled down toward the parking lot. Almost immediately after exiting his patrol vehicle, Brom noticed that Gargar's car was running—a fact captured by video footage from Brom's body camera. Brom then reentered his vehicle and parked it in front of Gargar's car, preventing it from exiting the parking space. Brom testified that he did so to prevent the car from rolling away if Gargar "had left the [car] in drive and [his foot was] just sitting on [his] brake," citing a concern for the safety of the various pedestrians in the parking lot that morning and for Gargar himself.

After repositioning his patrol vehicle, Brom approached Gargar's car to determine if it was in park and to check on Gargar. Looking into the car, Brom noticed an open can of Mike's Hard Lemonade in the center console and a half-consumed but capped bottle of vodka in the passenger seat. Brom called for backup before waking Gargar, and Officer Melvin Partido responded. Officers Partido and Brom positioned themselves on the passenger and driver sides of Gargar's car, respectively. Brom then awoke Gargar by tapping on his window. After Gargar rolled his window down at Brom's request, Brom asked him several questions concerning his residence at the motel and the ownership of his car.

Roughly a minute or so into this interaction, Brom noticed a gun in Gargar's car, tucked between the driver's seat and center console by Gargar's right leg. Brom immediately asked Gargar to place his hands on the steering wheel, then to unlock the car, and eventually to exit the car. Gargar followed Brom's instructions without incident. Brom placed Gargar in handcuffs, told him

2

he was detained, and read him his Miranda[1] rights. Upon retrieving and running Gargar's identification, Brom discovered that Gargar had an outstanding warrant and arrested him.

Gargar was charged with unlawful possession of a firearm in the first degree. Before trial, Gargar brought a CrR 3.6 motion to suppress all evidence following the moment Brom blocked his car, and the State brought a CrR 3.5 motion to admit Gargar's prearrest statements. The court heard testimony from Brom and Partido about their interaction with Gargar. Following their testimony, the court heard arguments on both motions. The court granted the CrR 3.5 motion in part but excluded any statements Gargar made after Brom read him his Miranda rights.

The court denied Gargar's CrR 3.6 motion to suppress. During argument on the CrR 3.6 motion, Gargar claimed that he was unlawfully seized when Brom initially repositioned his car in front of Gargar's and that Brom had no reasonable basis to suspect Gargar was engaging in criminal activity at that point. Therefore, Gargar contended, all fruits of the search following the moment Brom blocked Gargar's car should be suppressed. The State maintained that Brom performed a valid community caretaking function when he initially blocked Gargar's car. In addition, the State asserted that Gargar was not seized until

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

awoken, at which point his seizure was permissible under the Terry[2] stop exception to warrantless seizures.

In denying Gargar's CrR 3.6 motion, the court stated that an unconscious individual "wouldn't objectively know of any of the facts surrounding the encounter at that time until they actually gain consciousness," and concluded that Gargar was therefore not seized until he was awoken by Brom.  Over the course of argument, the trial court also made clear its impression that Brom's motivation for blocking Gargar's car in its parking spot was "exceedingly credible."  Brom testified that he blocked Gargar's car out of a concern that it could have rolled forward into the parking lot had Gargar fallen asleep with his foot on the brake pedal.  These concerns were heightened because Gargar's car was running and could have been in drive.  Further, the court opined that if Brom had indeed wanted to seize Gargar from the onset of this interaction, "[t]hen he would have parked his car in front of Mr. Gargar's the first time, but he didn't."

Because the court denied Gargar's CrR 3.6 motion, the firearm evidence Brom and Partido collected during their search of Gargar and his car was admitted at trial.  A jury found Gargar guilty of first degree possession of a firearm as a convicted felon.  He appeals.

ANALYSIS

Gargar asserts that the court erred in concluding that he was constitutionally seized when Brom parked his patrol vehicle in front of Gargar's car.  We conclude that the trial court did not err when it determined that Brom

---

[2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

was acting in his capacity as a community caretaker when he reparked his patrol vehicle. We further conclude that at the moment Brom noticed open containers of alcohol in Gargar's car, his community caretaking check transformed into a Terry stop, as Brom then possessed a reasonable articulable suspicion of criminal activity.

### Standard of Review

We review findings of fact entered after a suppression hearing using the substantial evidence standard to determine if they support the trial court's conclusions of law.[3] State v. Russell, 180 Wn.2d 860, 866, 330 P.3d 151 (2014). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of stated premise.' " Russell, 180 Wn.2d at 866-67 (internal quotation marks omitted) (quoting State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1038 (2009)). Conclusions of law will be reviewed de novo. State v. Boisselle, 194 Wn.2d 1, 14, 448 P.3d 19 (2019). Any unchallenged findings of fact are verities on appeal. State v. Johnson, 8 Wn. App. 2d 728, 737, 440 P.3d 1032 (2019).

### Exceptions to Warrantless Searches and Seizures

The Washington Constitution states: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Art. I, § 7. "This

---

[3] It should be noted that under CrR 3.6, the superior court "shall enter written findings of fact and conclusions of law" for appellate review if an evidentiary hearing is conducted. No such findings were entered. Failure to enter written findings of fact and conclusions of law is error, but it is a harmless error "if the court's oral findings are sufficient to allow appellate review." State v. Miller, 92 Wn. App. 693, 703, 964 P.2d 1196 (1998). The court's oral rulings are sufficient for appellate review. Additionally, Gargar did not raise any issue concerning the trial court's lack of written findings and conclusions on appeal.

provision protects 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.' " State v. Rankin, 151 Wn.2d 689, 694-95, 92 P.3d 202 (2004) (quoting State v. Myrick, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). The United States Constitution also protects against unreasonable searches and seizures. U.S. CONST. amend. IV. Therefore, "if a police officer's conduct or show of authority, objectively viewed, rises to the level of a seizure," it must be lawfully justified under these constitutional protections. State v. Meredith, 1 Wn.3d 262, 590-91, 525 P.3d 584 (2023) (quoting State v. O'Neill, 148 Wn.2d 564, 576, 62 P.3d 489 (2003)). Exceptions to these provisions are " 'narrowly and jealous[l]y drawn.' " State v. Day, 161 Wn.2d 889, 894, 168 P.3d 1265 (2007) (quoting State v. Stroud, 106 Wn.2d 144, 147, 720 P.2d 436 (1986)).

Two exceptions to the warrant requirement relevant in this case are Terry investigative stops and instances in which police serve their role as community caretakers. State v. Kinzy, 141 Wn.2d 373, 384-85, 5 P.3d 668 (2000).

### The Community Caretaking Exception

Gargar claims that "the court erred in finding the officers were justified in blocking in [his vehicle] on the basis of public safety" and alleges that Brom's invocation of the community caretaking exception to justify blocking Gargar's car in was pretextual. We conclude that Brom did not act pretextually when he blocked Gargar's car in but instead acted out of concern for the safety of Gargar and the pedestrians present in the parking lot. We further conclude that when

Brom initially blocked Gargar's car, any seizure that may have occurred was constitutionally permissible.

1. Pretext

As a threshold matter, we address Gargar's assertion that any reliance on community caretaking here was pretextual. Gargar contends that the community caretaking exception does not apply in this case because Brom "was motivated, at least in part, by a desire to investigate possible criminal activity" when he initially reparked his patrol vehicle to block Gargar's car. In other words, Gargar alleges that Brom used his role as a community caretaker pretextually.

A pretextual search occurs when officers rely on some legal authorization as a mere pretense " 'to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement.' " Boisselle, 194 Wn.2d at 15 (alteration in original) (quoting State v. Ladson, 138 Wn.2d 343, 358, 979 P.2d 833 (1999)). "The community caretaking function exception may not be used as a pretext for a criminal investigation." Kinzy, 141 Wn.2d at 394. "[W]hen determining whether a given search is pretextual, 'the court should consider the totality of the circumstances, including both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior.' " Boisselle, 194 Wn.2d at 15 (quoting Ladson, 138 Wn.2d at 359). It is imperative that "[t]he community caretaking function exception should be cautiously applied because of its potential for abuse." Kinzy, 141 Wn.2d at 395.

Brom's blocking of Gargar's car was not pretextual. The trial court found that when Brom noticed Gargar's car was running, "[h]e couldn't tell or hear that

7

the car was on when he was driving."[4]  It also found that Brom "initially park[ed] and he did not block the car at all.  He initially parks, gets out and realizes the car is on, realizes that the person in the driver's seat appears to be unconscious or asleep," and subsequently "moves his [vehicle] for safety purposes."  Footage from Brom's body camera admitted at the CrR 3.6 hearing confirms this, showing that he only spent twelve seconds outside of his vehicle before realizing Gargar's car was running.  Brom's body camera footage supports that he only saw the open containers in Gargar's car *after* he reparked his patrol vehicle and subsequently approached Gargar's car to see whether it was in park or not.  Relying on these facts, we conclude that nothing about Brom's interaction with Gargar would suggest that his reparking of his patrol vehicle was pretextual.  His intent was purely to render aid.

Gargar relies on the idea that Brom was patrolling a high-crime area when he first encountered Gargar to assert that he must have been acting with at least some intent to conduct a criminal investigation.  This fact, however, is not itself determinative that no pretext existed—we must look to the totality of the

---

[4] This statement, like others relied on in this opinion, is arguably not a finding of fact because it was made by the court during argument, not after.  But we nevertheless treat it as a finding for several reasons.  First, it is clear from the tenor of discussion during and after argument on the CrR 3.5 and CrR 3.6 hearings that the court held a single opinion throughout, unchanged by counsel.  Second, at the beginning of its official oral findings on the CrR 3.6 motion, the court says "I am going to deny, as I think everyone figured out through the argument, the motion to suppress."  We treat this as incorporating the court's statements during argument into its findings.  Finally, Gargar does not assign error to any findings of fact.  They are therefore treated as verities but we can also conclude that this failure also entitles us to assume that Gargar's arguments are purely legal in nature.

circumstances to determine whether the actual purpose of Brom's initial contact with Gargar arose out of a desire to investigate criminal activity. Brom's patrolling of a high-crime area was certainly the reason Brom was in a position to notice Gargar. But Gargar's car was running, and Gargar was apparently asleep in the driver's seat. The trial court found Brom's motivation to repark "exceedingly credible." Brom testified his motivation was solely to prevent Gargar's car from rolling out of its parking spot. The question here is whether Brom was acting pretextually when he blocked in Gargar's car. We conclude that Brom's patrolling of a high-crime area does not preempt the court's finding that his actions were not pretextual.

2. Community Caretaking Analysis

Having concluded that Brom did not act pretextually, we next determine whether his blocking in of Gargar's car was justified by the community caretaking exception to the warrant requirement.

A seizure by an officer without a warrant is per se unreasonable. Kinzy, 141 Wn.2d at 394. An exception, however, arises "when police are serving in their role as community caretakers." Kinzy, 141 Wn.2d at 394. The community caretaking function exception was borne out of a recognition that "law enforcement officers are 'jacks of all trades' and frequently engage in community caretaking functions that are unrelated to the detection and investigation of crime." Boisselle, 194 Wn.2d at 10. Such functions include " 'delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and administering first aid.' " Boisselle, 194 Wn.2d at 10

9

(quoting Kinzy, 141 Wn.2d at 387). The community caretaking function is categorized into "situations involving . . . emergency aid or routine checks on health and safety." Kinzy, 141 Wn.2d at 386. Additionally, "[b]oth situations may require police officers to render aid or assistance." Kinzy, 141 Wn.2d at 386.

Here, Brom was employing the emergency aid function of his community caretaking role. The emergency aid function " 'arises from a police officer's community caretaking responsibility to come to the aid of persons believed to be in danger of death or physical harm.' " Boisselle, 194 Wn.2d at 12 (internal quotation marks omitted) (quoting Kinzy, 141 Wn.2d at 396 n.39). Further, "the emergency aid function involves circumstances of greater urgency and searches resulting in greater intrusion" than routine checks on health and safety. Kinzy, 141 Wn.2d at 386. In this case, the court found it credible that Brom acted out of a concern that either Gargar or one of the pedestrians in the parking lot faced imminent harm had Gargar's car been in drive.

Washington has developed several alternative methods to analyze whether the emergency aid function of the community caretaking exception is justified, so the Boisselle court found it necessary to synthesize the competing formulations. Boisselle, 194 Wn.2d at 14. Additionally, courts must " 'cautiously apply the community caretaking function exception because of a real risk of abuse in allowing even well-intentioned stops to assist.' " State v. Moore, 129 Wn. App. 870, 879, 120 P.3d 635 (2005) (internal quotation marks omitted) (quoting State v. Acrey, 148 Wn.2d 738, 750, 64 P.3d 594 (2003)). The emergency aid function of the community caretaking exception applies when:

(1) the officer subjectively believed that an emergency existed requiring that he or she provide immediate assistance to protect or preserve life or property, or to prevent serious injury, (2) a reasonable person in the same situation would similarly believe that there was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched.

Boisselle, 194 Wn.2d at 14.

Additionally, "[i]f a warrantless search falls within the emergency aid function, a court resumes its analysis and weighs the public's interest against that of the citizen's." Boisselle, 194 Wn.2d at 12. That weighing of interests involves balancing "a citizen's privacy interest in freedom from police intrusion against the public's interest in having police perform a 'community caretaking function.' " Boisselle, 194 Wn.2d at 12 (quoting Kinzy, 141 Wn.2d at 394).

Regarding the first Boisselle factor, we conclude, relying on the trial court's determinations, that Brom subjectively believed that Gargar and the surrounding pedestrians required immediate assistance. The trial court found that it is "entirely consistent with [Officer Brom] being concerned about the safety of Mr. Gargar and others that he moves his car after he gets out and realizes that the car was on." The court also found that Gargar was unconscious until Brom woke him up: "What . . . is peculiar or suspicious is to see someone slumped with their head at an odd angle. That is only consistent with someone that is either passed out or asleep."

Brom testified that he blocked the car "for safety of others," and that "people were coming going [sic] down that hill all the time and going around our car." On the basis of this testimony, the court concluded that Brom had a reasonable belief that Gargar and the surrounding pedestrians in the parking lot

11

required immediate assistance. Brom was worried that Gargar had fallen asleep or unconscious while his car was still in drive, and that his foot was merely resting on the brake. Brom's actions were informed by his experience dealing with "vehicles that people had left the vehicle in drive and are just sitting on their brake," and he testified that he acted to mitigate the "possibility of that person letting up off the brake in a vehicle driving forward." Thus, Brom subjectively believed that immediate assistance would be required to ensure the safety of those around him.

Regarding the second Boisselle factor, we conclude that a reasonable person in Brom's position would believe there was a need for assistance. The trial court concluded that the facts of the case "are consistent with Officer Brom in particular being concerned for both Mr. Gargar's safety and the safety of other people in the parking lot that there's someone who is unconscious behind the steering well [sic] of a car that is on." The court further held that an unconscious individual "behind the driver's seat of a car that is on is a public safety threat." We agree that the potential harm that a rolling car could cause in the parking lot would lead a reasonable person in Brom's position to believe that Gargar required assistance.

Regarding the third Boisselle factor, we conclude that Brom had reason to associate the things Gargar claims he seized—Gargar and his car—with a need for assistance. It is important to note that while the third Boisselle factor only explicitly mentions "searches," the community caretaking function has long excused both unwarranted searches and seizures. See Kinzy, 141 Wn.2d at 386

(holding that "the community caretaking function exception [encompasses] . . . the 'search and seizure' of automobiles"). Since Brom's primary concern when he reparked his patrol vehicle was to prevent Gargar's car from rolling forward had it been in drive, he reasonably associated a need for assistance with Gargar and his car. Brom reasonably exercised the emergency aid function of the community caretaking exception.

Finally, having concluded that the Boisselle emergency aid factors have been met, we turn to whether the public's interest in Officer Brom performing a community caretaking check on Gargar outweighs Gargar's own interest in freedom from police intrusion. We conclude that it does. On the one hand, the public possessed a significant interest in the safety of the pedestrians that were present in the Sunset Motel's parking lot, the property located there, as well as Gargar's own safety. On the other hand, while Gargar certainly possesses an interest in freedom from police interference, the potential safety threat he posed to the public means that this interest cannot overcome the public's own interest in Brom performing a community caretaking function. This is particularly true because Gargar was asleep and did not even realize Brom had blocked his car in until Brom woke him up.

Therefore, even if we were to conclude that a seizure occurred when Brom initially parked his patrol vehicle in front of Gargar's car, that seizure would

be permissible and not pretextual pursuant to Brom's role as a community caretaker.[5]

The Terry Stop Exception

Gargar also asserts that Brom did not have a reasonable suspicion that he was engaging in criminal activity under the Terry stop exception to warrantless searches. We conclude that Gargar's interaction with Brom began as a community caretaking function and shifted into a Terry investigative stop at the moment Brom noticed open alcohol containers in Gargar's running vehicle. Thus, throughout their interaction, an exception to the warrant requirement existed.

Terry stops are an exception to the warrant requirement. Johnson, 8 Wn. App. 2d at 746. A Terry stop is permissible if an officer can articulate a reasonable suspicion, based on objective facts and the totality of the circumstances, that the person stopped has been or is about to be involved in criminal activity. Terry, 392 U.S. at 21-22. An analysis of the totality of the circumstances includes factors such as "the detaining officer's experience and training, the location of the investigatory detention, and the suspect's conduct." Johnson, 8 Wn. App. at 747. Washington has incorporated Terry stops as an

---

[5] Gargar claims he was seized from the moment Officer Brom first reparked his vehicle in front of Gargar's car. The State disagrees, asserting that Gargar could not be seized because he was asleep, and therefore unable to feel unfree to leave. We do not reach whether a seizure occurred when Gargar was asleep, because any seizure would be allowable due to the community caretaking exception to the warrant requirement.

exception to the warrant requirement within our state jurisprudence.  <u>Kinzy</u>, 141 Wn.2d at 384-85.

Here, Brom looked into Gargar's car and saw two open containers of alcohol.  Given that Gargar asleep in the driver's seat of a running car, Brom had a reasonable articulable suspicion that Gargar had physical control over his car while under the influence, in violation of RCW 46.61.504(1)(c).

We affirm.

_Smith, C.J._

WE CONCUR:

_Colum, J._                    _Hazel, A.C.J_