

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE___SEP 1 2 2019
Fairhurst. CJ.
CHIEF JUSTICE

This opinion was
filed for record
at 8am on Sept. 12, 2019

Susan L. Carlson
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 95858-1 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| MICHAEL CLIFFORD BOISSELLE, | ) | |
| | ) | Filed ___SEP 1 2 2019___ |
| Petitioner. | ) | |
| | ) | |

OWENS, J. — Law enforcement officers were dispatched to Michael Clifford

Boisselle's home after two anonymous 911 calls reported that a man named Mike shot

and possibly killed someone at the residence. While responding to the calls, the

officers learned that the residence was related to an ongoing missing person/homicide

investigation. Unable to determine whether someone was alive inside the home, the

officers entered the residence and conducted a warrantless search, discovering

evidence of a murder therein. Boisselle moved to suppress the evidence, arguing that

the officers' warrantless search was unlawful under article I, section 7 of the

Washington Constitution. The trial court denied Boisselle's motion, concluding that

the officers' search fell within the emergency aid function of the community

caretaking exception to the warrant requirement. Following a jury trial, Boisselle was convicted of second degree murder and second degree unlawful possession of a firearm. The Court of Appeals affirmed his convictions.

We hold that the officers' warrantless search of Boisselle's home was a pretext for a criminal investigation because the officers had significant suspicions of criminal activity, the officers' entry was motivated by the desire to conduct an evidentiary search, and there was no present emergency. Accordingly, the search did not fall within the emergency aid function of the community caretaking exception to the warrant requirement and thus violated article I, section 7. Therefore, the trial court's findings of fact do not support its conclusions of law and the trial court erred in denying Boisselle's motion to suppress. We reverse the Court of Appeals and remand to the trial court for further proceedings.

## FACTS

On August 13, 2014, a passerby notified law enforcement of a man fleeing the scene of a roadside fire. Auburn Police Detective Douglas Faini responded to the fire and located a pile of charred, bloodied debris, including carpet, carpet padding, laminate flooring, a towel, and a spent bullet casing. Due to the amount of blood on the items, Detective Faini "feared . . . that someone could be either seriously injured on the side somewhere, or deceased" and initiated a missing person/homicide investigation. 4 Verbatim Report of Proceedings (VRP) at 613. Detective Faini sent the items to the crime lab for DNA (deoxyribonucleic acid) testing, which rendered a

match to Brandon Zomalt. Later in his investigation, Detective Faini identified Boisselle as a suspect.

At 6:38 p.m. on September 1, South Sound 911 received an anonymous call regarding a possible homicide at a duplex unit in Puyallup. The anonymous caller reported that a friend named Mike said that he had shot and possibly killed someone at the duplex unit in self-defense. Soon after, the Puyallup Police Department's tip line received a similar anonymous call reporting a possible dead body in the unit.

Law enforcement was subsequently dispatched to the duplex unit. Pierce County Sheriff's Deputies Ryan Olivarez and Fredrick Wiggins responded to the residence at approximately 6:50 p.m. Both Deputies Olivarez and Wiggins knocked on the front door of the unit multiple times, but they did not receive a response. The deputies proceeded to walk around the duplex and heard a dog barking aggressively inside the unit as they approached. The deputies could not see inside the unit as the lights were off and the blinds and curtains were drawn throughout.

Pierce County Sheriff's Sergeant Christopher Adamson arrived at the duplex unit around 7:13 p.m. Sergeant Erik Clarkson arrived soon after. Due to the nature of the anonymous phone calls, both Sergeants Adamson and Clarkson "wanted to confirm, as best [they] could, that there may or may not have been a crime, or there may or may not have been a victim." 1 VRP at 89. While walking around the unit, Sergeant Clarkson noted a foul odor emanating from the garage. He believed the smell was either rotting garbage or a decomposing body.

3

As Sergeants Adamson and Clarkson approached a sliding glass door at the rear of the duplex unit, the dog inside came up to the door and pushed aside the blinds covering the door, allowing the sergeants to see inside the unit. Sergeant Clarkson saw furniture overturned in the living room of the unit and signs of a struggle. Sergeant Adamson also noted that carpet in the living room had been ripped out, which "is never a good sign in police work. It's something that's sometimes used to cover up a crime scene." 1 VRP at 31. Sergeant Clarkson determined "[i]t's a very suspicious welfare check at this point" and called animal control to secure the dog inside the unit in case he and Sergeant Adamson decided to enter the home. *Id.* at 32.

The deputies and Sergeant Adamson began contacting neighbors to obtain more information. Neighbors stated that a man named Mike lived in the duplex unit and that although there was usually heavy traffic in and out of the unit, they had not seen anyone in the last four or five days. The officers determined that the duplex unit was Boisselle's last known address.

Sergeant Clarkson then noticed a man across the street taking particular interest in law enforcement's activities. Sergeant Clarkson approached the man, who identified himself as Christopher Williamson. Williamson stated that his friend Zomalt lived in the duplex with Boisselle and that he had not seen Zomalt in several weeks. Williamson also mentioned that Zomalt was associated with a missing person investigation in Auburn and asked if the officers "had details [on the] location of [Zomalt's] body." Def.'s Ex. 12.

4

At approximately 8:00 p.m., there was a phone call between Sergeant Clarkson and Detective Faini. It is unclear from this court's record who made initial contact with whom, and the exact content of the phone call is not part of this court's record. During the call, Detective Faini informed Sergeant Clarkson of the roadside fire and the missing person/homicide investigation concerning Zomalt. Detective Faini also stated that he would be interested to know whether any carpet was missing from the duplex unit. Shortly after, a second phone call between Sergeant Clarkson and Detective Faini took place; the record is silent as to what was discussed during this second call.

Both Sergeants Adamson and Clarkson decided to enter the unit and conduct a warrantless search, believing the emergency aid function of the community caretaking exception to the warrant requirement justified entry. Sergeant Adamson noted that he had "suspicion of a crime." 1 VRP at 95. Sergeant Clarkson determined:

> Dealing with a suspicious welfare check and possibly someone that's down inside, has been hurt or dead, we don't know. So at that point I'm thinking the bottom line is you can't walk away from this. You have got a duty to do something.
> . . . .
> . . . There's too much information to say that . . . something possibly happened inside. With what we . . . observed, the information I received from Detective Faini, the two anonymous tips, you can't just walk away from something like that.

1 VRP at 45-46. Law enforcement and animal control entered the duplex unit at 8:20 p.m. The officers located Zomalt's body in the garage of the unit and later secured a warrant to search the remainder of the home.

5

The State charged Boisselle with first degree murder or, in the alternative, second degree murder, and second degree unlawful possession of a firearm. Prior to trial, Boisselle moved to suppress evidence obtained as a result of the warrantless search of his home. Boisselle argued that the officers' warrantless search did not fall within the emergency aid function because the officers did not subjectively believe that someone was inside the home needing assistance for health and safety reasons.

The trial court denied Boisselle's motion to suppress and issued findings of fact and conclusions of law. The trial court ultimately concluded that the officers' entry into Boisselle's home fell within the community caretaking exception because the officers subjectively believed that either Zomalt or Boisselle "could be dead or injured and therefore require assistance for health or safety reasons." Clerk's Papers (CP) at 362. The trial court also concluded that the officers were not motivated to enter the unit to investigate a potential crime and that their entry was not a pretext for conducting an evidentiary search.

Following a jury trial, Boisselle was convicted of second degree murder and second degree unlawful possession of a firearm. Boisselle appealed his convictions, arguing that the trial court erred in denying his motion to suppress because the officers' search of his home did not fall within the emergency aid function of the community caretaking exception under either article I, section 7 of the Washington Constitution or the Fourth Amendment to the United States Constitution. *State v. Boisselle*, 3 Wn. App. 2d 266, 276-77, 415 P.3d 621 (2018). The Court of Appeals

6

affirmed Boisselle's convictions, holding that the officers' search was permissible because they had a reasonable belief that someone inside the duplex unit likely needed aid or assistance. *Id.* at 287. The court declined to address Boisselle's Fourth Amendment argument, reasoning that Boisselle did not provide adequate briefing to resolve the issue. *Id.* at 277 n.6. Boisselle petitioned this court for review, which this court granted. *State v. Boisselle*, 191 Wn.2d 1004 (2018).

## ISSUES

I.      What test does this court employ to determine whether an officer exercised his or her emergency aid community caretaking function when conducting a warrantless search?

II.     Did the officers' warrantless search of Boisselle's home violate article I, section 7 because the search did not fall within the emergency aid function of the community caretaking exception to the warrant requirement?

III.    Should this court adopt a new rule permitting law enforcement officers to make warrantless searches of homes under the community caretaking exception in order to recover decomposing bodies?

## ANALYSIS

Boisselle argues that the trial court erred in denying his motion to suppress evidence obtained as a result of law enforcement officers' warrantless search of his home because the officers' search did not fall within the emergency aid function of the community caretaking exception to the warrant requirement. We hold that the

officers' warrantless search of Boisselle's home was a pretext for a criminal investigation because the officers had significant suspicions of criminal activity, the officers' entry was motivated by the desire to conduct an evidentiary search, and there was no present emergency. As a result, the officers' search did not fall within the emergency aid function of the community caretaking exception, and it violated article I, section 7. Therefore, the trial court's findings of fact do not support its conclusions of law and the trial court erred in denying Boisselle's motion to suppress.

I.    Application of the Community Caretaking Exception

As an initial matter, Boisselle contends that this court's jurisprudence concerning the community caretaking exception generally, and the emergency aid function specifically, is convoluted and unclear. We agree that the application of the community caretaking exception has become muddled, and we take this opportunity to clarify the appropriate factors in determining whether an officer has exercised his or her emergency aid community caretaking function.

Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Under this provision, warrantless searches are per se unreasonable. *State v. Bravo Ortega*, 177 Wn.2d 116, 122, 297 P.3d 57 (2013). However, there are a few "carefully drawn and jealously guarded exceptions to the warrant requirement." *Id.* The State bears a heavy burden in showing that a warrantless search falls within one of these exceptions. *Id.*

8

The community caretaking exception is one such exception to the warrant requirement. *State v. Thompson*, 151 Wn.2d 793, 802, 92 P.3d 228 (2004). Under the community caretaking exception, law enforcement officers may make a limited invasion of constitutionally protected privacy rights when it is necessary for officers to perform their community caretaking functions. *Id.* This exception recognizes that law enforcement officers are "jacks of all trades" and frequently engage in community caretaking functions that are unrelated to the detection and investigation of crime, "'including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid.'" *State v. Kinzy*, 141 Wn.2d 373, 387, 5 P.3d 668 (2000) (quoting *Hudson v. City of Wenatchee*, 94 Wn. App. 990, 996, 974 P.2d 342 (1999)).

The United States Supreme Court first announced the community caretaking exception in *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). In *Cady*, an off-duty law enforcement officer from Chicago was arrested in Wisconsin for driving while intoxicated. *Id.* at 436. Local law enforcement believed that Chicago officers were required to carry a service revolver at all times, but they did not locate a revolver on the Chicago officer's body. *Id.* In an effort to protect the public and to locate the revolver, local law enforcement conducted a warrantless search of the Chicago officer's vehicle and found the revolver, as well as evidence linking the Chicago officer to a murder. *Id.* at 436-38. The United States Supreme Court determined that the warrantless search of the vehicle was reasonable

9

under the Fourth Amendment because the officers were engaged in their community caretaking functions and were not investigating a crime. *Id.* at 441. The Court reasoned:

> Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.*

Washington adopted the community caretaking exception recognized in *Cady* and expanded the exception to include "not only the 'search and seizure' of automobiles, but also situations involving either emergency aid or routine checks on health and safety." *Kinzy*, 141 Wn.2d at 386 (footnote omitted).

This court first articulated the appropriate test for determining whether the community caretaking exception applies to a warrantless search in *Kinzy*. *See id.* at 394. In *Kinzy*, this court held that in order for the community caretaking exception to apply, a court must first be satisfied that the officer's actions were "totally divorced" from the detection and investigation of criminal activity. *Id.* at 385. Accordingly, a court must determine the threshold question of whether the community caretaking exception was used as a pretext for a criminal investigation before applying the community caretaking exception test. *Id.* at 394; *see State v. Smith*, 177 Wn.2d 533, 557, 303 P.3d 1047 (2013) (Chambers, J. Pro Tem., dissenting).

10

The *Kinzy* court held that when a law enforcement officer's search is not pretextual, the applicable test under article I, section 7 depends on the community caretaking function the officer utilized. 141 Wn.2d at 386-87. The community caretaking exception "normally applies to police encounters involving emergency aid and routine checks on health and safety." *Id.* at 394.

When a warrantless search falls within an officer's general community caretaking function, such as the performance of a routine check on health and safety, courts must next determine whether the search was reasonable. *Id.* at 387. "Where . . . an encounter involves a routine check on health and safety, its reasonableness depends upon a balancing of a citizen's privacy interest in freedom from police intrusion against the public's interest in having police perform a 'community caretaking function.'" *Id.* at 394. If the public's interest outweighs the citizen's privacy interest, the warrantless search was reasonable and was permissible under our state constitution. *See id.* at 388-89; *State v. O'Neill*, 148 Wn.2d 564, 597, 62 P.3d 489 (2003) (Chambers, J., concurring in part, dissenting in part).

An officer's emergency aid function, however, "'arises from a police officer's community caretaking responsibility to come to the aid of persons believed to be in danger of death or physical harm.'" *Kinzy*, 141 Wn.2d at 386 n.39 (quoting *State v. Leupp*, 96 Wn. App. 324, 330, 980 P.2d 765 (1999)). "[C]ompared with routine checks on health and safety, the emergency aid function involves circumstances of greater urgency and searches resulting in greater intrusion." *Id.* at 386. Accordingly,

11

courts apply additional factors to determine whether a warrantless search falls within the emergency aid function of the community caretaking exception. *See id.* at 386-87.

Under *Kinzy*, the emergency aid function of the community caretaking exception applies when "'(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched.'" *Id.* (quoting *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994)). If a warrantless search falls within the emergency aid function, a court resumes its analysis and weighs the public's interest against that of the citizen's. *See id.* at 394.

More than a decade after setting out this three-part emergency aid function test, this court decided *State v. Schultz*, which appeared to add three additional factors to the *Kinzy* test: "(4) there is an imminent threat of substantial injury to persons or property, (5) state agents must believe a specific person or persons or property is in need of immediate help for health or safety reasons, and (6) the claimed emergency is not a mere pretext for an evidentiary search." 170 Wn.2d 746, 754, 248 P.3d 484 (2011). Although this court used language that seemingly approved of the formulation and use of these additional factors, this court neither addressed the new factors nor explained their necessity. *See id.* at 763 (Fairhurst, J., dissenting). "In addition to appearing to be dicta, the . . . new factors are unnecessary because they are subsumed in the original three-part test." *Id.*

12

In *Smith*, a plurality of this court advocated for yet another version of the emergency aid function test:

> Washington courts have held on many occasions that law enforcement may make a warrantless search of a residence if (1) it has a reasonable belief that assistance is immediately required to protect life or property, (2) the search is not primarily motivated by an intent to arrest and seize evidence, and (3) there is probable cause to associate the emergency with the place to be searched.

177 Wn.2d at 541.

We now take the opportunity to clarify which factors apply when determining whether an officer exercised his or her emergency aid community caretaking function. In keeping with long-standing precedent, we adhere to the three-part emergency aid test announced in *Kinzy*. *See CLEAN v. City of Spokane*, 133 Wn.2d 455, 486, 947 P.2d 1169 (1997) (holding that this court does not accord a prior holding precedential weight where it is dictum and unnecessary surplusage, and that this court may clarify any ambiguity the prior holding creates). However, we note that *Kinzy* does not clearly convey that the emergency aid function test necessitates an emergency requiring immediate assistance for health and safety reasons. *See* 141 Wn.2d at 386 ("But compared with routine checks on health and safety, the emergency aid function involves circumstances of greater urgency."). As a result, we believe it is necessary to amend the three-part *Kinzy* test to make clear that there must be a present emergency for the emergency aid function test to apply. Accordingly, we hold that the emergency aid function of the community caretaking exception applies when (1) the

officer subjectively believed that an emergency existed requiring that he or she provide immediate assistance to protect or preserve life or property, or to prevent serious injury, (2) a reasonable person in the same situation would similarly believe that there was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched.

II.    The Warrantless Search of Boisselle's Home Was Pretextual

Boisselle argues that the trial court erred in denying his motion to suppress evidence obtained as a result of law enforcement officers' warrantless search of his home because the officers' search did not fall within the emergency aid function of the community caretaking exception to the warrant requirement. We agree. We hold that the officers' warrantless search of Boisselle's home was a pretext for a criminal investigation. Accordingly, the officers' warrantless search violated article I, section 7, and the trial court erred in denying Boisselle's motion to suppress.

We review the denial of a motion to suppress to determine whether substantial evidence supports the trial court's findings of fact and whether the findings of fact support the trial court's conclusions of law. *State v. Russell*, 180 Wn.2d 860, 866, 330 P.3d 151 (2014). We review the trial court's conclusions of law de novo. *Id.* at 867.

To determine whether the law enforcement officers exercised their emergency aid community caretaking function in conducting a warrantless search of Boisselle's home, we must answer the threshold question of whether the officers' search was a pretext for a criminal investigation. *Kinzy*, 141 Wn.2d at 394. A pretextual search

14

occurs when officers rely on some legal authorization as a mere pretense "to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement." *State v. Ladson*, 138 Wn.2d 343, 358, 979 P.2d 833 (1999). When determining whether a given search is pretextual, "the court should consider the totality of the circumstances, including both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior." *Id.* at 359.

Viewing the totality of the circumstances, we are unconvinced that the officers' search of Boisselle's home was not a pretext for a criminal investigation. Law enforcement's involvement began because of two anonymous 911 calls reporting a crime. When the officers arrived at Boisselle's duplex unit, they noticed a smell that could be attributed to a decomposing body, and they sought to confirm whether a crime had been committed or if a crime victim was inside. The officers were eventually able to see into the unit and saw signs of a struggle and missing carpet, which could be a sign that someone sought to cover up a crime scene. The officers spoke with Detective Faini after Williamson asked about the location of Zomalt's body. Detective Faini notified the officers that Boisselle's unit may be related to an ongoing missing person/homicide investigation in which Zomalt had been identified as a victim. The officers confirmed that Zomalt was living in the duplex unit with Boisselle and that no one had seen either man for at least several days. The officers also had suspicions that a crime had taken place and that "[w]ith what [they] observed, the information . . . from Detective Faini, the two anonymous tips, you can't

15

just walk away from something like that." 1 VRP at 45-46. The officers then decided to make entry and conduct a warrantless search of Boisselle's home—nearly two hours after they had arrived at the residence.

Taken together, these facts demonstrate that the officers were suspicious, if not convinced, that a crime had taken place. Because of the officers' significant suspicions, the search of Boisselle's home was necessarily associated with the detection and investigation of criminal activity. *See United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) ("The community caretaking function of the police cannot apply where, as here, there is significant suspicion of criminal activity."). While the officers purportedly entered Boisselle's home to render aid or assistance, the officers were not solely motivated by a perceived need to provide immediate aid. Indeed, the trial court found that the officers "were not able to confirm an immediate emergency existed." CP at 358. Instead, the officers sought to perform their official duties to uncover whether a crime had taken place and whether a crime victim was located inside Boisselle's home. When officers act to uncover criminal activity, their actions are of the very type that article I, section 7's warrant requirement is directed. "It is well settled that in order to search for evidence of a crime, police must have probable cause that a crime has been committed." *People v. Davis*, 442 Mich. 1, 12, 497 N.W.2d 910 (1993).

Although the trial court concluded that the officers' warrantless search of Boisselle's home was not pretextual, we hold that the trial court's findings of fact do

16

not support such a conclusion. Because the officers had significant suspicions of criminal activity, the officers were conducting a criminal investigation, and there was no present emergency, it was objectively unreasonable for the officers to conduct a warrantless search of Boisselle's home. Consequently, it appears that the officers used the emergency aid community caretaking function as a mere pretense for an evidentiary search. Accordingly, the officers' warrantless search of Boisselle's home was pretextual and did not fall under the emergency aid function of the community caretaking exception.[1] Thus, the trial court's findings of fact do not support its conclusions of law, and the trial court erred in denying Boisselle's motion to suppress.

Importantly, we note that our holding does not prevent law enforcement from conducting a warrantless search of a home for purposes of a criminal investigation when exigent circumstances are present.[2] "The emergency aid doctrine is different from the 'exigent circumstances' exception to the warrant requirement." *Kinzy*, 141 Wn.2d at 386 n.39. Although both doctrines involve situations where law enforcement must act immediately, "[u]nlike the exigent circumstances exception,

---

[1] Boisselle also argues that the Court of Appeals violated his right to appeal by declining to address whether the officers' warrantless search of his home violated his Fourth Amendment rights under the United States Constitution. Because we hold that the officers' warrantless search violated article I, section 7 and reverse the Court of Appeals' decision, we do not reach this issue. Moreover, we do not decide the question of whether the officers' search also violated the Fourth Amendment because we resolve this case on independent and adequate state grounds. *See State v. Patton*, 167 Wn.2d 379, 396 n.9, 219 P.3d 651 (2009).

[2] It is also important to note that our holding does not prevent law enforcement from entering a home to retrieve an abandoned, starving animal. *See* RCW 16.52.085(1) ("If a law enforcement officer or animal control officer has probable cause to believe that an owner of a domestic animal has violated this chapter . . . the officer may authorize, with a warrant, the removal of the animal to a suitable place for feeding and care.").

17

'the emergency [aid] doctrine does not involve officers investigating a crime.'" *Id.*

(second alteration in original) (quoting *Leupp*, 96 Wn. App. at 330); *see Davis*, 442

Mich. at 22 ("[T]he defining characteristic of community caretaking functions is that

they are totally unrelated to the criminal investigation duties of the police."). As a

result,

> A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention.
> When acting to investigate and uncover crime, on the other hand, a police officer acts at the core of his or her duties . . . . A warrantless entry in such circumstances must be justified by probable cause to believe that a crime has been or is being committed and the existence of what are called exigent circumstances.

*United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (citations omitted).

III.     We Reject the State's Proposed "Dead Body" Rule

The State asks this court to adopt a new rule permitting law enforcement officers

to make warrantless entries into homes under the community caretaking exception in

order to recover decomposing bodies. Specifically, the State suggests:

> Under the community caretaking exception to the warrant requirement, if officers have a sincere and well-founded or reasonable concern that unattended human remains are present in a place, and that there is probable cause to associate that concern with that place, then the officers may make a limited sweep of that place to verify or dispel that concern.

Suppl. Br. of Resp't at 7. We decline to adopt such a rule.

It is a basic principle that "searches and seizures inside a home without a

warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586,

100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Indeed, exceptions to the warrant requirement are "carefully drawn and jealously guarded." *Ortega*, 177 Wn.2d at 122. The State fails to explain why it is necessary to expand the carefully drawn community caretaking exception to encompass a law enforcement officer's sincere and well-founded concern that a decomposing body may be found in a home. In fact, it is difficult to imagine an example where a law enforcement officer's noncriminal concern would not fall within the existing community caretaking exception. *See, e.g.*, *State v. Gocken*, 71 Wn. App. 267, 277, 857 P.2d 1074 (1993) (holding that a warrantless search of an elderly woman's home to check on her health and well-being fell within the emergency aid community caretaking function).

The State suggests that "[w]hether criminal agency is suspected, or not, the need to humanely recover the dead body remains a constant community caretaking need." Suppl. Br. of Resp't at 6. Although a number of activities fall within law enforcement officers' community caretaking functions, not every exercise of a caretaking function will fall within the community caretaking exception. The defining characteristic of the community caretaking exception under article I, section 7 is that the warrantless search is totally unrelated to the criminal investigation duties of police and is not a pretext for a criminal investigation. Accordingly, granting law enforcement officers unfettered authority to enter homes and search for decomposing bodies would contravene article I, section 7 and eviscerate the community caretaking exception. Because the community caretaking exception to the warrant requirement

19

adequately provides for the recovery of decomposing bodies, we decline to adopt the State's proposed "dead body" rule.

## CONCLUSION

We take this opportunity to clarify the appropriate factors in determining whether an officer has exercised his or her emergency aid community caretaking function. We hold that courts must first determine the threshold question of whether an officer's warrantless search was used as a pretext for a criminal investigation before applying the community caretaking exception test. If the officer's search was not pretextual, the emergency aid function of the community caretaking exception will apply when (1) the officer subjectively believed that an emergency existed requiring that he or she provide immediate assistance to protect or preserve life or property, or to prevent serious injury, (2) a reasonable person in the same situation would similarly believe that there was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched.

Further, we hold that the officers' warrantless search of Boisselle's home was a pretext for a criminal investigation because the officers had significant suspicions of criminal activity, the officers' entry was motivated by the desire to conduct an evidentiary search, and there was no present emergency. Accordingly, the officers' warrantless search did not fall under the emergency aid function of the community caretaking exception, and it violated article I, section 7. Thus, the trial court's findings of fact do not support its conclusions of law, and the trial court erred in

20

denying Boisselle's motion to suppress.  We reverse the Court of Appeals and remand

to the trial court for further proceedings.

WE CONCUR:

_Owens, J._

_Fairhurst, C.J._

_Madsen, J._

_Gordon McCloud, J._

_Yu, J._

*State v. Boisselle (Michael Clifford)*
(Stephens, J., dissenting)

No. 95858-1

STEPHENS, J. (dissenting)—The community caretaking function exception to the warrant requirement recognizes that local law enforcement officers do more than investigate crime. They also serve the public by responding to health, safety, and general welfare concerns. We tolerate limited intrusions into constitutionally protected realms of privacy to address these concerns, so long as the community caretaking justification is the real reason for the intrusion and not a mere pretext for an investigatory search or seizure. Today, the majority posits a categorical rule prohibiting courts from applying the community caretaking function exception if officers also have some criminal suspicion. The majority also rejects application of the exception absent a "present emergency," majority at 13, 17, despite long-standing precedent recognizing that health, safety, and welfare needs come in many varieties that justify police response. Because I believe that the officers in this case

validly performed a community caretaking function when they entered Boisselle's

home and that their entry was not a pretext for a criminal investigation, I respectfully

dissent. I would affirm the lower courts and uphold Michael Boisselle's conviction.

I. The Majority Mistakenly Construes the "Totally Divorced" Language in *Cady v. Dombrowski* To Mean That Officers Cannot Conduct a Search under the Community Caretaking Function If There Is Any Criminal Suspicion

The majority's view of the community caretaking function exception hinges

on its reading of *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d

706 (1973). It mistakenly construes the "'totally divorced'" language in *Cady* to

mean that searches conducted under the community caretaking function are

constitutional only if officers have no subjective criminal suspicion. Majority at 10.

*Cady* did not announce such a rule. The Supreme Court's "totally divorced"

language in *Cady* was merely descriptive, identifying the different roles of local

police officers juxtaposed against those of federal officers.[1] The court in *Cady* was

---

[1] The full excerpt from *Cady* reads, "Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. *Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*" 413 U.S. at 441 (emphasis added).

not prescribing a threshold test for the exercise of community caretaking functions. To the contrary, the facts in *Cady* suggest that officers may exercise such functions in the face of criminal suspicions, as the officer in that case lawfully searched the trunk of an impounded car for a suspected gun, notwithstanding the prior discovery of a blood-covered flashlight in the passenger compartment. *Id.* at 447-48.

Recognizing Washington's adoption of the community caretaking function exception derived from *Cady*, the majority cites *State v. Kinzy*, 141 Wn.2d 373, 5 P.3d 668 (2000) for the proposition that "in order for the community caretaking exception to apply, a court must first be satisfied that the officer's actions were 'totally divorced' from the detection and investigation of criminal activity." Majority at 10 (citing *Kinzy*, 141 Wn.2d at 385). But that is not what *Kinzy* says. The *Kinzy* opinion merely quotes from the passage from *Cady* set out above in footnote 1 and observes, "As noted in *Cady*, the community caretaking function exception is totally divorced from a criminal investigation." *Kinzy*, 141 Wn.2d at 385. Again, this is descriptive language, and does not announce a "threshold" requirement. Majority at 20. Neither *Cady* nor *Kinzy* holds that officers may not have criminal suspicion while engaging in their community caretaking functions. *See Cady*, 413 U.S. at 447; *Kinzy*, 141 Wn.2d at 389. Instead, these cases recognize that searches conducted under the community caretaking function must actually and

reasonably be motivated by public safety or welfare, rather than by an investigatory purpose.

*Kinzy* is consistent with other Washington cases holding that officers need not be devoid of criminal suspicion to undertake community caretaking functions. In *State v. Acrey*, 148 Wn.2d 738, 64 P.3d 594 (2003), officers initiated a *Terry*[2] stop in response to a report that the defendant was engaged in criminal conduct, so the contact was expressly motivated by criminal suspicion. *Id.* at 746. This court nevertheless held that, once the officers confirmed the defendant was not committing a crime, they were justified under the community caretaking function exception when they extended "'what had been a valid *Terry* stop'" and contacted the underage defendant's mother. *Id.* at 752-53 (quoting *State v. Acrey*, 110 Wn. App. 769, 777, 45 P.3d 553 (2002)). In *State v. Villarreal*, 97 Wn. App 636, 644, 984 P.2d 1064 (1999), which this court cited favorably in *Kinzy*, the Court of Appeals held that an officer's stop of a man seen urinating in public was justified under the community caretaking function, even though the officer also had reasonable suspicion the man was committing a misdemeanor.

Like Washington, other states similarly recognize that officers may conduct searches within their community caretaking function even when they have criminal

---

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

suspicion. *E.g., Commonwealth v. Livingstone*, 644 Pa. 27, 174 A.3d 609 (2017) (holding that "totally divorced" in the context of community caretaking does not mean that police lack criminal suspicion but that the search is independent of that suspicion); *see also State v. Kramer*, 2009 WI 14, 315 Wis. 2d 414, 759 N.W.2d 598 (holding that officers can have criminal suspicion while conducting a community caretaking function). Of course, courts across the country vary widely in their application of the community caretaking exception. *See State v. Deneui*, 2009 S.D. 99, 775 N.W.2d 221 (discussing the many approaches state courts take to the community caretaking exception). The majority's reliance on *United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) is therefore not well taken, as it reflects but one approach that is out of step with our precedent.

Limiting the community caretaking function exception to situations completely devoid of any criminal suspicion would undermine the value of community caretaking. As the Wisconsin Supreme Court explained:

> In regard to our community caretaker analysis, the nature of a police officer's work is multifaceted. An officer is charged with enforcing the law, but he or she also serves as a necessary community caretaker when the officer discovers a member of the public who is in need of assistance. As an officer goes about his or her duties, an officer cannot always ascertain which hat the officer will wear—his law enforcement hat or her community caretaker hat. . . . Accordingly, the officer may have law enforcement concerns, even when the officer has an objectively reasonable basis for performing a community caretaker function.
>
> . . . .

> Furthermore, to interpret the "totally divorced" language in <u>Cady</u> to mean that an officer could not engage in a community caretaker function if he or she had any law enforcement concerns would, for practical purposes, preclude police officers from engaging in any community caretaker functions at all. This result is neither sensible nor desirable.

*Kramer*, 315 Wis. 2d at 433-35.

Like the Wisconsin Supreme Court, we here recognized that local police officers provide many services; they render assistance, respond to emergencies, and investigate crimes. *Kinzy*, 141 Wn.2d 387; *Acrey*, 148 Wn.2d at 748. All of these functions are essential to the continued safety and well-being of the people of Washington. It is therefore imperative that we continue to recognize that officers can and should engage in community caretaking functions when necessary and are not prohibited from doing so simply because they have some criminal suspicion. As explained in the next section, the safeguard against abuse is not to isolate the community caretaking function to entirely suspicionless situations but, rather, to ensure that this warrant exception is not used as a mere pretext for criminal investigations. *Kinzy*, 141 Wn.2d at 394.

II. The Majority Mistakenly Equates Its "Totally Divorced" Threshold Inquiry with the Distinct Inquiry into Whether a Community Caretaking Search Is a Pretext for an Investigatory Search

The majority recognizes that pretext is the critical inquiry in evaluating the validity of a community caretaking search or seizure, but it seemingly construes the "totally divorced" passage from *Cady* to be the pretext inquiry:

> [I]n order for the community caretaking exception to apply, a court must first be satisfied that the officer's actions were "totally divorced" from the detection and investigation of criminal activity. *Accordingly*, a court must determine the threshold question of whether the community caretaking exception was used as a pretext for a criminal investigation before applying the community caretaking exception test.

Majority at 10 (emphasis added) (citation omitted). The majority cites only *Kinzy* and the solo dissent in *State v. Smith*, 177 Wn.2d 533, 303 P.3d 1047 (2013) (plurality opinion) for this assertion. But, as explained, the community caretaking function exception does not require a threshold finding of no criminal suspicion. The court in *Kinzy* acknowledged only that "[t]he community caretaking function exception may not be used as a *pretext* for a criminal investigation." *Kinzy*, 141 Wn.2d at 394 (emphasis added).

*Kinzy* is consistent with long-standing precedent recognizing that pretextual searches and seizures are unconstitutional under article I, section 7 of the Washington State Constitution. *State v. Ladson*, 138 Wn.2d 343, 357-58, 979 P.2d 833 (1999). That precedent makes clear that the presence of criminal suspicion does not render an exercise of the community caretaking function automatically pretextual. The pretext inquiry seeks to deter abuses of law enforcement discretion by requiring that the actual reason for a warrantless search or seizure be a valid one. *Ladson*, 138 Wn.2d at 357 ("the police may not abuse their authority to conduct a warrantless search or seizure under a narrow exception to the warrant requirement

-7-

when the reason for the search or seizure does not fall within the scope of the reason for the exception"); *see also State v. Houser*, 95 Wn.2d 143, 622 P.2d 1218 (1980) (holding police may exercise community caretaking function of removing abandoned vehicle, but not as pretext for unrelated criminal investigation). To determine pretext, courts "'consider the totality of the circumstances, including both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior.'" *State v. Chacon Arreola*, 176 Wn.2d 284, 296, 290 P.3d 983 (2012) (quoting *Ladson*, 138 Wn.2d at 359).

Our decision in *Chacon Arreola* underscores that the pretext analysis does not require the absence of criminal suspicion, but it often considers multiple, mixed motives for a warrantless search or seizure. There, we refused to suppress evidence obtained during a traffic stop that was motivated by both suspicion of impaired driving and a desire to investigate an altered muffler for public safety reasons. *Id.* Though the (invalid) investigatory purpose was one reason for the officer's actions, we held that the stop was not pretextual under article I, section 7 because an "actual, conscious, and independent cause of the traffic stop" was for traffic safety and general welfare. *Id.* at 297.

The majority makes no attempt to tease apart the arguably mixed motives of the officers in this case because it erroneously concludes that their suspicion of

criminal activity meant "the officers were conducting a criminal investigation." Majority at 17. Under our precedent, even if the officers were motivated in part by an investigatory purpose, this is not enough to establish that their entry into Boisselle's home to perform a community caretaking function was pretextual. Instead, in a mixed motive case, the pretext test turns on whether the reason for the search or seizure falls within the scope of the reason for the exception. *See Ladson*, 138 Wn.2d at 357. If it does, then that reason is an actual, conscious, and independent cause for the search or seizure. *Chacon Arreola*, 176 Wn.2d at 300.

The trial court below specifically found that the officers who entered Boisselle's home subjectively believed that someone inside "could be dead or injured and therefore require assistance for health or safety reasons." Clerk's Papers (CP) at 362; *see also* 1 Verbatim Report of Proceedings (VRP) at 45-46 (testimony of Sergeant Erik Clarkson (there was "possibly someone that[ was] down inside, [had] been hurt or dead")).[3] Despite having criminal suspicion, rendering assistance was an independent reason for their entry, as evidenced by the fact that, once they located and confirmed a dead body in the garage, they left and sought a warrant to

---

[3] While the majority focuses solely on the officers having concerns about a dead body in the home, their testimony and the trial court's finding was that they feared someone might be dead or injured. CP at 359, 362. The pretext inquiry does not require that the officers be correct about their concerns, it requires only that they act reasonably under the circumstances. *Ladson*, 138 Wn.2d at 359.

search the home. CP at 360. Considering both the subjective intent of the officers and the objective reasonableness of their actions, there is no support for the majority's conclusion of pretext. *See Chacon Arreola*, 176 Wn.2d at 299 (holding traffic stop based on both legitimate and illegitimate reasons was not pretextual "even if the legitimate reason for the stop is secondary and the officer is motivated primarily by a hunch or some other reason that is insufficient to justify a stop"). The presence of some criminal suspicion by the officers does not establish pretext because, as the trial court found, the officers' desire to exercise their community caretaking function was an "actual, conscious, and independent cause" for the entry. *Id.* at 300.

III. The Majority Misapplies Precedent Addressing the Lawful Scope of the Community Caretaking Function Exemption to Erroneously Require an Emergency in Order To Justify Entry into a Home

The majority recognizes that case law applying the community caretaking function exception to the warrant requirement has become "muddled." Majority at 8. Unfortunately, in attempting to clarify the analysis, the majority introduces further confusion by creating a "test" that draws false, sharp lines between "emergency aid" situations and general health and safety situations. *Id.* at 11-14. The majority's newly minted test reflects a misreading of our holding in *Kinzy*, which described various aspects of the community caretaking function exception

and provided an analysis to determine the *lawful scope* of a warrantless search or seizure in emergency aid situations under this exception. 141 Wn.2d at 386-87.

This court in *Kinzy* observed that the community caretaking function exception encompasses searches and seizures conducted in emergency situations as well as those conducted for general public health, safety, or welfare reasons. *Id.* In setting out a three-part inquiry for identifying emergencies, we recognized that the reasonableness of law enforcement actions "'made for noncriminal[,] noninvestigatory purposes . . . depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a "community caretaking function."'" *Id.* at 387 (quoting *Kalmas v. Wagner*, 133 Wn.2d 210, 216-17, 943 P.2d 1369 (1997)); *see State v. Thompson*, 151 Wn.2d 793, 92 P.3d 228 (2004) (applying *Kinzy*'s three-part test to a search that was allegedly conducted to ensure public health and safety). The majority mistakenly reads *Kinzy* to require distinct tests for general health and safety versus emergency aid situations, but the only difference between these two situations is the degree of urgency or public need. Simply put, the greater or more urgent the need, the greater the intrusion that may be justified. *Kinzy*, 141 Wn.2d at 386.

The majority holds that the emergency aid exception applies only when there is an immediate need "to protect or preserve life or property, or to prevent serious

injury," whereas presumably a routine check on health and safety, while still requiring prompt police attention, does not involve the degree of risk to public health and safety as an emergency. Majority at 13-14. From this, it concludes that *Kinzy* must be amended to require a real emergency and holds that dead body cases are not emergencies. This "clarification" and any distinction between the two common situations arising under the community caretaking function is entirely unnecessary. The third inquiry set out in *Kinzy* sufficiently accounts for varying degrees of need or urgency in particular situations, with the goal of ensuring that any intrusion be reasonable in scope. 141 Wn.2d at 387. This inquiry takes into account whether an emergency is present and may require a greater intrusion to respond. *Id.*; *see also State v. Schroeder*, 109 Wn. App. 30, 32 P.3d 1022 (2001) (holding that an officer's search for a suicide victim's identification after the victim's roommate/girlfriend had identified him and the officer was waiting for the coroner exceeded the scope of the need); *State v. Gibson*, 104 Wn. App. 792, 17 P.3d 635 (2001) (holding that when the defendant was under the influence of marijuana and therefore could be a danger to herself, the officer, or her children, the officer's search of her bedroom was within the scope of community caretaking); *Smith*, 177 Wn.2d at 542 (plurality holding that

warrantless entry into motel room was justified under the community caretaking exception when the officer saw an injured person inside).[4]

The majority's bifurcation of the community caretaking function into emergency aid and ordinary health and safety situations is not only unnecessary, it is harmful. The majority's holding in this case illustrates the harm to public safety— forbidding entry into a home to confirm whether someone is injured or dead, and thus determine whether there is even a "present emergency." Majority at 13, 17. The majority's rule will preclude officers from rendering aid or assistance when it is plainly needed. Certainly, a credible report of a possible dead body in a home, coupled with officers' detection of a foul odor and signs of struggle, and the presence of a dog in the home, warrants some community caretaking response. It is not reasonable to say that a dead body presents no "emergency." As one of the responding officers testified, "[Y]ou can't walk away from this." 1 VRP at 45-46.

Rather than drawing artificial lines between emergency and nonemergency community caretaking functions, and finding no emergency here, we should clarify that the relevant distinction is between law enforcement criminal investigations, on

---

[4] It is unclear why the majority finds it important to validate a warrantless home entry "to retrieve an abandoned, starving animal." Majority at 17 n.2. This is not a claimed basis for the officers' entry here, and the majority's citation to an animal abuse statute does not suffice to show authority of law under article I, section 7. It may be that a warrantless entry to retrieve an animal would be justified under the community caretaking function exception in particular circumstances, but that question is not before us.

the one hand, and activities that are undertaken for "'noncriminal[,] noninvestigatory purposes,'" on the other. *Kinzy*, 141 Wn.2d at 387 (quoting *Kalmas*, 133 Wn.2d at 216-17). This latter category defines the community caretaking function, and it encompasses a variety of situations with varying degrees of need and urgency. Courts may appropriately assess the lawfulness of each asserted community caretaking situation based on the totality of its circumstances.

IV. Upholding the Officers' Entry into Boisselle's Home under the Community Caretaking Function Exception Does Not Amount to a "Dead Body" Exception to the Warrant Requirement

Properly applying the community caretaking analysis and guided by the considerations set out in *Kinzy*, we must consider whether the officers in this case

> "(1) . . . subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched."

141 Wn.2d 386-87 (quoting *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994), *review denied*, 125 Wn.2d 1021, 890 P.2d 463 (1995)). I would answer all three inquiries in the affirmative. The trial court specifically found that the officers subjectively believed that someone inside "could be dead or injured and therefore require assistance for health or safety reasons." CP at 362. This belief was reasonable because the officers knew the residence was associated with a possible homicide, saw signs of a struggle and missing carpet, and smelled a foul odor they

-14-

believed could be a decomposing body emanating from the garage area. CP at 356. Their observations provided a reasonable basis to associate the need for assistance with the place entered. Furthermore, consistent with the reason for exercising their community caretaking function, their entry was limited in scope—once officers discovered the body in the garage, they left the residence and sought a search warrant. CP at 360; *see Mincey v. Arizona*, 437 U.S. 385, 392-93, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (holding that officers may conduct warrantless searches to respond to an emergency but that they must obtain a warrant before searching beyond the scope of the emergency). I agree with the trial court that the officers' actions were therefore justified under the community caretaking function exception.

Holding the entry here to be a constitutionally valid exercise of the community caretaking function does not amount to recognizing a "dead body rule" exception. Majority at 18-20. It is merely the result of applying our long-standing community caretaking and pretext analyses, as explained above. The majority's contrary holding—that the officers' concern about a possible dead body did not present an emergency justifying their entry—sets a dangerous precedent that conflicts with decisions of our sister courts. *See United States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005) (holding that the belief that "there might be a dead body" in a residence constituted an emergency justifying a warrantless search because someone

-15-

could be dead or injured); *People v. McGee*, 140 Ill. App. 3d 677, 489 N.E.2d 439, 95 Ill. Dec. 218 (1986) (same); *Johnson v. Florida*, 386 So. 2d 302, 304 (Fla. Dist. Ct. App. 1980) (same). The District Court of Appeal of Florida in *Johnson* observed:

> The preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties; it is an overriding justification for what otherwise may be an illegal entry. It follows that a search warrant is not required to legalize an entry by police for the purpose of bringing emergency aid to an injured person. Frequently, the report of a death proves inaccurate and a spark of life remains sufficient to respond to emergency police aid. As a general rule, we think an emergency may be said to exist . . . whenever the police have credible information that an unnatural death has, or may have, occurred. And the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact.

*Id.* (quoting *Webster v. State*, 201 So. 2d 789, 792 (Fla. Dist. Ct. App. 1967)).

While not every situation involving a reported dead body may justify a warrantless home entry, we should recognize the seriousness of such a report, just as other courts have. We should evaluate the totality of the circumstances in each case and not reject as a matter of law application of the community caretaking function exception in this context.

I would affirm the Court of Appeals and uphold Boisselle's conviction. The officers' limited entry into Boisselle's home was justified under the community caretaking function exception.

Stephens, J.

González, J.

Wiggins, J