IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36788-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| EDWIN ESPEJO, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, C.J. — Edwin Espejo appeals his convictions for attempted first degree murder and unlawful possession of a firearm. We affirm.

## FACTS

Law enforcement officers were dispatched to Mr. Espejo's home in response to a domestic violence call. When the first officer arrived, he encountered several children outside. The children were crying and yelling "'he is hitting her'" while motioning their fists to their eyes. 4 Report of Proceedings (Feb. 25, 2019) at 612. The children said the incident was taking place inside the house. The officer called for backup and asked to be taken into the home. A child took the officer inside to the top of the basement stairs and told the officer that the assailant, named "Edwin," was downstairs. The officer waited at the top of the stairs for backup to arrive. While waiting, the officer could hear the sounds of children downstairs, whimpering and crying.

Once backup arrived, the initial officer called for Edwin to come upstairs. He did not. The officers then headed downstairs. About halfway down the stairs the officers noticed a child walking back and forth and crying, and helped him to get upstairs. Once in the basement, officers saw Edwin Espejo sitting on a bed with two young children in his lap. The children were crying and upset. The officers convinced Mr. Espejo to let the children go.

As soon as all the children were gone, Mr. Espejo moved his hands to his pants pockets. The outline of a firearm could be seen in Mr. Espejo's left pocket. Mr. Espejo was ordered to show his hands. He did not immediately comply. Instead, he removed a handgun from his pocket and slid it under a pillow on the bed. Mr. Espejo began to cry and writhe on the bed while the officers unsuccessfully ordered him to move away from the gun. Mr. Espejo told the officers to get out of his house. He insisted he was not going back to jail and kept saying, "'I am going to grab it; I am going to grab it.'" *Id*. at 620.

Additional officers arrived and entered the basement area. Several officers drew firearms, keeping them at a low ready position. At one point, an officer drew a stun gun.

Officers went back and forth with Mr. Espejo for a few minutes, ordering him to stay away from the gun and to come toward them. At one point, Mr. Espejo picked up the gun. Officers ordered Mr. Espejo to drop the gun on the bed, which he did. Mr. Espejo

then clenched his fists and began to stand up while removing his shirt. It appeared to the officers Mr. Espejo was preparing to fight. The stun gun was deployed on Mr. Espejo in an effort to get him detained.

The stun gun was only partially effective. After being hit, Mr. Espejo fell onto the bed and then reached for the gun. Officers told Mr. Espejo, "'Don't grab it; don't grab it; don't grab it.'" *Id.* at 623. Mr. Espejo grabbed the gun and began firing at the officers. Officers returned fire, hitting Mr. Espejo multiple times. After the shooting, bullet holes were found in the washing machine and staircase behind the officers. One of the officers found a bullet hole through his pants.

Mr. Espejo survived the shooting with several injuries. He was taken into custody and charged with three counts of attempted first degree murder, second degree unlawful possession of a firearm, fourth degree domestic violence assault, and interfering with the reporting of domestic violence. Before trial, Mr. Espejo moved under CrR 3.6 to suppress the evidence collected from his home, arguing the officers unlawfully searched the home without a warrant. The trial court denied the motion.

At the close of the State's evidence at trial, Mr. Espejo unsuccessfully moved for a directed verdict. Mr. Espejo then called one of the officers back as a witness in the defense case-in-chief. The jury found Mr. Espejo guilty of three counts of attempted first

degree murder and one count of second degree unlawful possession of a firearm.

Mr. Espejo now appeals.

ANALYSIS

*Sufficiency of the evidence*

Due process requires the State to prove all elements of a charged crime beyond a

reasonable doubt. *State v. Chacon*, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). Our review

of whether the State has met its burden requires substantial deference to the jury. When

assessing the sufficiency of the State's proof, we view the evidence in the light most

favorable to the State. *State v. Crowder*, 196 Wn. App. 861, 868, 385 P.3d 275 (2016).

"Evidence is sufficient to support a conviction where . . . any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *Id*.[1]

Attempted first degree murder requires proof of premediated intent. *State v.*

*Barajas*, 143 Wn. App. 24, 36, 177 P.3d 106 (2007). "Premeditation is 'the deliberate

formation of and reflection upon the intent to take a human life and involves the mental

---

[1] Mr. Espejo contends the trial court should have granted his motion for a directed verdict because the State failed to present sufficient evidence of premeditation during its case-in-chief. However, because Mr. Espejo presented evidence during his case-in-chief, his assignment of error is properly treated as a challenge to the sufficiency of the evidence presented at the entire trial. *State v. Allen*, 116 Wn. App. 454, 465 n.6, 66 P.3d 653 (2003).

process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *Id.* (*quoting State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991)). Factors relevant to premeditation include "[m]otive, procurement of a weapon, stealth, and the manner of killing." *Id.* "The defendant's statements may be considered when determining whether the defendant acted with premeditation." *Id.*

The evidence here amply supports premeditation. Our focus is not limited to the moments between when Mr. Espejo was hit with the stun gun and when he fired at the officers. We take a broader perspective. Testimony from law enforcement showed Mr. Espejo began thinking of using his gun against the police when he reached into his pockets and moved his hands around. Throughout the encounter in the basement, Mr. Espejo refused orders to distance himself from the firearm. Prior to being hit with the stun gun, Mr. Espejo twice accessed his gun and put it down. During the entire process, Mr. Espejo was emotional and angry. He told the officers to get out of his house, that he was going to grab his firearm, and that he would not go back to jail. Viewed in the light most favorable to the State, Mr. Espejo's actions and words suggest he was deliberating on using his gun against the officers in order to create a lethal encounter. Mr. Espejo's ultimate objective may have been to get himself killed. Regardless, there was sufficient evidence to support the jury's finding of premeditation.

5

*Suppression motion*

In addition to challenging the jury's verdict, Mr. Espejo appeals the trial court's denial of his suppression motion. Because Mr. Espejo has not disputed any of the trial court's factual findings, our review is limited to a de novo assessment of the law. *See State v. Griffith*, 11 Wn. App. 2d 661, 670, 455 P.3d 152 (2019).

Law enforcement officers generally need a warrant to enter a private residence; however, an exception exists for emergency actions taken as part of the officers' community caretaking responsibilities. The community caretaking exception applies when officers are not acting under an investigative pretext and three factors are met:

> (1) the officer[s] subjectively believed that an emergency existed requiring that [they] provide immediate assistance to protect or preserve life or property, or to prevent serious injury, (2) a reasonable person in the same situation would similarly believe that there was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched.

*State v. Boisselle*, 194 Wn.2d 1, 14, 448 P.3d 19 (2019).

The record here supports all components of the community caretaking exception. There was no evidence of pretext; at the time of entry, the sole objective was to respond to an ongoing domestic disturbance. In addition: (1) officers made plain their subjective concern was to protect the individuals in Mr. Espejo's home from further injuries, (2) this concern was reasonable, particularly given the dangers posed by domestic violence, and

No. 36788-6-III
*State v. Espejo*

(3) it was abundantly clear the ongoing danger was occurring in Mr. Espejo's basement. Given the information available to law enforcement, it would have been irresponsible for officers to ignore the cries and distress of the children and decline entry into Mr. Espejo's home. Once inside, the officers appropriately continued their response to the ongoing emergency. No warrant was necessary under these circumstances.[2]

## CONCLUSION

The judgment of conviction is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____, C.J.
Pennell, C.J.

WE CONCUR:

_____, J.
Fearing, J.

_____, J.P.T.
Korsmo, J.P.T.[3]

---

[2] Even if the emergency exception did not apply, Mr. Espejo's arguments would fail because the exclusionary rule does not apply to evidence of an assault against law enforcement officers. *State v. Mierz*, 127 Wn.2d 460, 473-74, 901 P.2d 286 (1995).

[3] Judge Kevin M. Korsmo was a member of the Court of Appeals at the time argument was held on this matter. He is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.